THE HONORABLE THOMAS S. ZILLY

1

2

3

4

5

6              UNITED STATES DISTRICT COURT
7           WESTERN DISTRICT OF WASHINGTON
                       AT SEATTLE

8  RAILCAR MANAGEMENT, LLC,

9                      Plaintiff,                    NO. 2:21-cv-00437-TSZ

10         v.                                        **DEFENDANTS CEDAR AI, INC., MARIO
                                                     PONTICELLO, AND DARIL VILHENA'S
11  CEDAR AI, INC., MARIO PONTICELLO, DARIL          ANSWER AND AFFIRMATIVE DEFENSES
    VILHENA, and JOHN DOES 1 through 10,             AND DEFENDANT CEDAR AI, INC.'S
12  inclusive,                                       COUNTERCLAIM AND THIRD-PARTY
                       Defendants.                   COMPLAINT**
13

14

15  CEDAR AI, INC.,

16                     Counterclaim Plaintiff,

17         v.

18  RAILCAR MANAGEMENT, LLC, GE
    TRANSPORTATION, WABTEC CORPORATION,
19
                       Counterclaim and Third-
20                     Party Defendants.

21

22         DEFENDANTS CEDAR AI, INC. ("Cedar"), MARIO PONTICELLO, and DARIL VILHENA

23  (collectively, "Defendants"), by and through the undersigned counsel, file this Answer and

24  Affirmative Defenses.  Counterclaim Plaintiff CEDAR AI, INC. alleges the following Counterclaims

25  against RAILCAR MANAGEMENT, LLC ("RMI"), and Third-Party Complaint against GE

26  TRANSPORTATION ("GE") and WABTEC CORPORATION ("Wabtec").

27

**GENERAL DENIAL AND ANSWER**

Defendants generally deny each and every allegation in the Amended Complaint (Dkt. 22) that requires a response except those items specifically admitted herein.  Defendants respond to each allegation of the Amended Complaint as follows:

**ANSWER**

1.      The preliminary information that RMI obtained in this lawsuit confirms that Cedar and the individual Defendants have been engaging in unlawful, unfair, and unscrupulous business practices attempting to poach RMI's customers for its RailConnect Transportation Management System ("TMS"), in violation of both federal and state laws.

**ANSWER: Deny.**

2.      RMI's TMS is a core operational system for railroads that helps railroads maximize performance by automating day-to-day operations.  Rail operators use RMI's TMS to manage their rail and intermodal operations, signal communication assets, railcar repair billing and inventory, and multi-modal visibility, planning, and execution for industrial shippers and logistics service providers.

**ANSWER: Defendants admit only that RMI's TMS is a transportation management system for railroads.  Defendants lack knowledge regarding the remaining allegations in this paragraph and therefore are unable to admit or deny.  To the extent a response is required, deny.**

3.      Cedar also offers rail companies a transportation management system.  Cedar claims that its system is the first to leverage artificial intelligence to present users with suggestions for handling traffic and customer billing.  Since its inception, Cedar has hired several former employees of RMI's parent company, Wabtec Corporation ("Wabtec").

**ANSWER: Defendants admit that Cedar offers rail companies a transportation management system and that Cedar's system leverages artificial intelligence to present users with suggestions for handling traffic and customer billing.  Defendants also admit that Cedar hired individuals who approached Cedar regarding job opportunities after having worked for**

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 2
Case No. 2:21-cv-00437-TSZ

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  **RMI and GE, which merged with Wabtec in 2019.  The remaining allegations in this paragraph**

2  **are denied.**

3         4.     In March 2020, Wabtec sent a letter to Cedar's co-chief executive officers ("co-

4  CEOs"), Ponticello and Vilhena, asking that Cedar stop its aggressive tactics to recruit Wabtec

5  employees and stating that it "has strong concerns about the potential misuse of Wabtec

6  confidential and proprietary data." Ponticello responded to Wabtec's letter in April 2020.  He

7  described Cedar's recruitment practices as lawful and affirmed that "we do not have access to

8  any of your confidential and proprietary data."

9         **ANSWER: Defendants admit that Wabtec sent a letter to Messrs. Ponticello and**

10  **Vilhena in March 2020.  Defendants deny that Cedar engaged in recruitment or solicitation**

11  **efforts directed at Wabtec employees, or that Cedar's communications with former Wabtec**

12  **employees were aggressive.  Further, Defendants admit that Mr. Ponticello refuted Wabtec's**

13  **allegations, confirmed the lawfulness of Cedar's hiring practices, and affirmed Cedar did "not**

14  **have access to [any of RMI's] confidential and proprietary data." The remaining allegations in**

15  **this paragraph are denied.**

16         5.     RMI initiated this lawsuit after it detected highly unusual activity on TMS—i.e.,

17  more frequent logins to the platform and an abnormal spike in the frequency and volume of

18  data downloaded from certain customers' accounts.  Its investigation of that activity identified

19  Amazon Web Services ("AWS")-owned IP addresses for the devices connected to the suspicious

20  logins and downloads.  With the Court's permission, RMI subpoenaed AWS to identify the

21  owners of these IP addresses.

22         **ANSWER: Defendants lack knowledge regarding the allegations in this paragraph and**

23  **therefore are unable to admit or deny.  To the extent a response is required, deny.**

24         6.     Information produced by AWS in response to the subpoena, attached as Exhibit

25  A, revealed that Cedar owns the IP addresses in question, that the account for those IP

26  addresses is registered to Vilhena, and that Ponticello is the billing contact for the account.

27         **ANSWER: Admit.**

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 3
Case No. 2:21-cv-00437-TSZ

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 ● FAX 206.319.5450
www.terrellmarshall.com

7. The information from AWS conclusively proves that Cedar both accessed TMS without RMI's authorization and downloaded RMI's confidential data, likely over many months before RMI detected the activity. On information and belief, Cedar used the confidential data it downloaded from TMS to gain a competitive advantage when performing demonstrations for RMI's customers. In other words, Cedar used the proprietary data that it stole from RMI to then compete with RMI. On information and belief, Ponticello and Vilhena were personally involved in, directed, or approved of this unlawful activity.

**ANSWER: Defendants admit only that Cedar accessed snapshot data feeds belonging to certain railroads from an external FTP server. Defendants deny Cedar accessed the data feeds without RMI's authorization. Defendants further deny that the railroads' snapshots contained any confidential or proprietary data, let alone data that Cedar could use to gain a competitive advantage over, or compete with, RMI. Defendants further deny that they stole anything. Defendants affirmatively allege that RMI not only knew Cedar was accessing certain railroads' data feeds, but authorized Cedar's access of the data feeds. Those feeds contained information about individual railroads, not data belonging to RMI. Defendants lack knowledge regarding the remaining allegations in this paragraph and therefore are unable to admit or deny. To the extent a response is required, deny.**

8. Cedar and the individual Defendants' actions violate the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, et seq. and the Stored Communications Act, 18 U.S.C. § 2701 et seq., 18 U.S.C. § 1836 et seq., both of which in addition to providing the civil causes of action stated below, impose criminal liability on intruders like Cedar. RMI also brings claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq., and the laws of Washington for misappropriation of trade secrets, unfair competition, tortious interference, and unjust enrichment.

**ANSWER: This paragraph consists of legal conclusions to which no response is required. To the extent a response is required, deny.**

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    9.    RMI seeks compensatory damages for the multimillion-dollar losses it has

2    sustained due to Defendants' unlawful and improper conduct; punitive damages; preliminary

3    and permanent relief barring Cedar from, among other things, accessing TMS and soliciting

4    RMI's customers using stolen data; reasonable attorneys' fees and costs; and pre-and post-

5    judgment interest.

6    **ANSWER: This paragraph consists of legal conclusions to which no response is**

7    **required.  To the extent a response is required, deny.**

8                                    **JURISDICTION AND VENUE**

9    10.    This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises from

10   Defendants' violation of the federal statutes identified in this Amended Complaint.

11   **ANSWER: This paragraph consists of legal conclusions to which no response is**

12   **required.**

13   11.    This action also arises under the laws of Washington.  This Court has jurisdiction

14   over those claims under 28 U.S.C. § 1367 because Defendants' conduct giving rise to the state

15   law claims are the same as or related to the activities giving rise to the claims arising under

16   federal law such that they form part of the same case or controversy.

17   **ANSWER: This paragraph consists of legal conclusions to which no response is**

18   **required.**

19   12.    Venue for RMI's claims is proper in this district under 28 U.S.C. § 1391(b)

20   because Cedar's principal place of business is in Seattle, Washington, located in this district.

21   The individual Defendants also reside in Seattle, Washington.  In addition, events giving rise to

22   this action occurred in Bothell, Washington, located within this district.  For example, one of the

23   Defendants logged into TMS from Bothell, Washington, and improperly downloaded RMI's

24   data.

25   **ANSWER: This paragraph consists of legal conclusions to which no response is**

26   **required.  To the extent a response is required, Defendants admit that Cedar's principal place**

27   **of business is located in Seattle, Washington, that one of the individual Defendants resides in**

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  **Seattle, Washington, and that venue is proper in this district under 28 U.S.C. § 1391(b).  To**

2  **the extent not expressly admitted, denied.**

3  **PARTIES**

4  13.  RMI is a subsidiary of Wabtec, a leading global provider of equipment, systems,

5  digital solutions, and other freight and transit rail services.  RMI delivers software and related

6  solutions to optimize its customers' railway operating and maintenance activities.  RMI is and

7  was at all times relevant to this action a limited liability company incorporated under the laws

8  of Georgia with its principal place of business in Atlanta, Georgia.

9  **ANSWER: Defendants lack knowledge regarding the allegations in this paragraph and**

10  **therefore are unable to admit or deny.  To the extent a response is required, deny.**

11  14.  Cedar, which offers service and technology to the rail industry, is incorporated

12  under the laws of Delaware and has a principal place of business in Seattle, Washington.

13  **ANSWER: Admit.**

14  15.  Mario Ponticello is Cedar's co-CEO and chief financial officer.  Ponticello resides

15  in Seattle, Washington.

16  **ANSWER: Defendants admit that Defendant Ponticello is Cedar's co-CEO and chief**

17  **financial officer.  Defendants deny that Defendant Ponticello resides in Seattle, Washington.**

18  16.  Daril Vilhena is Cedar's co-CEO.  Vilhena resides in Seattle, Washington.

19  **ANSWER: Admit.**

20  17.  John Does 1 through 10 are the fictitious names of the individuals involved in,

21  along with or at the direction of Cedar, Ponticello, or Vilhena, the unlawful conduct described

22  here.  RMI sues John Does 1 through 10 until we determine their true names through discovery.

23  **ANSWER: Defendants lack knowledge regarding the allegations in this paragraph and**

24  **therefore are unable to admit or deny.  To the extent a response is required, deny.**

25

26

27

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 6
Case No. 2:21-cv-00437-TSZ

**BACKGROUND**

*RMI's TMS*

18.    As a core operating and communications system, TMS automates and tracks the entry of rail car movements and switching operations for RMI's rail customers and provides them high visibility over all rail assets.

**ANSWER: Defendants admit only that RMI's TMS is a transportation management system for railroads, which like any other railroad transportation management system, tracks the entry of rail car movements and switching operations for certain railroads.  Defendants lack knowledge regarding the remaining allegations in this paragraph and therefore are unable to admit or deny.  To the extent a response is required, deny.**

19.    TMS contains data relating to, among other things, customers' rail cars, including content and location, routing and railroad information, and the origins and destination of rail cars, and proprietary data derived from the raw data RMI collects (collectively, the "Data").  The Data is stored in on-premises systems located in Atlanta, Georgia.

**ANSWER: Defendants admit only that RMI-authorized snapshots related to certain railroads, which were uploaded to an external FTP server, contain data relating to customers' rail cars, including content and location, routing and railroad information, and the origins and destinations of rail cars.  Defendants lack knowledge regarding the remaining allegations in this paragraph, including the existence of any proprietary data and where it might be stored, and therefore are unable to admit or deny.  To the extent a response is required, deny.**

20.    RMI's rail customers access TMS via a website interface hosted by AWS, a well-known provider of on-demand cloud computing platforms and application programming interfaces to individuals, companies, and governments.

**ANSWER: Defendants lack knowledge regarding the allegations in this paragraph and therefore are unable to admit or deny.  To the extent a response is required, deny.**

21.    RMI assigns each of its rail customers unique login credentials to access TMS, and only RMI can authorize someone to use the credentials to enter the system.  Indeed, RMI

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1   and its customers expressly agree in written contracts that customers will keep their login

2   credentials strictly confidential.

3        **ANSWER: Defendants admit only that RMI assigns each of its rail customers unique**

4   **login credentials to access snapshot data feeds uploaded to an external FTP server, and only**

5   **RMI can authorize someone to use the credentials to access those snapshots. Defendants**

6   **lack knowledge regarding the remaining allegations in this paragraph, including how one**

7   **accesses RMI's system or the substance of RMI's written contracts, and therefore are unable**

8   **to admit or deny. To the extent a response is required, deny.**

9        22.    Furthermore, TMS conspicuously and explicitly warns those logging into the

10   system that they must have RMI's permission to use it:

11               You have accessed the RMI computer system. Access or use of

12               this system is strictly limited to persons having express
               authorization from RMI. Unauthorized access or use of this

13               system is unlawful and strictly prohibited.

14        **ANSWER: Defendants lack knowledge regarding the allegations in this paragraph and**

15   **therefore are unable to admit or deny. To the extent a response is required, deny.**

16                                    *The Suspicious Activity*

17        23.    While RMI's rail customers routinely download Data in TMS, on or about

18   November 1, 2020, RMI identified an unusual spike in the frequency and volume of downloads.

19        **ANSWER: Defendants lack knowledge regarding the allegations in this paragraph and**

20   **therefore are unable to admit or deny. To the extent a response is required, deny.**

21        24.    After conducting a preliminary investigation, RMI observed that the unusual

22   activity was triggered by devices oddly requesting simultaneous file downloads from multiple

23   customer accounts, each with unique customer login credentials.

24        **ANSWER: Defendants lack knowledge regarding the allegations in this paragraph and**

25   **therefore are unable to admit or deny. To the extent a response is required, deny.**

26        25.    Several of RMI's rail customers said they had not logged onto TMS and

27   downloaded Data. Accordingly, RMI launched an internal investigation to verify that the

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 8
Case No. 2:21-cv-00437-TSZ

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  downloads it observed were indeed illegitimate and to determine whether an unauthorized

2  person accessed TMS.

3      **ANSWER**: **Defendants lack knowledge regarding the allegations in this paragraph and**

4  **therefore are unable to admit or deny.  To the extent a response is required, deny.**

5  *Forensic Investigation*

6      26.    On or about November 6, 2020, RMI retained an outside vendor to conduct a

7  forensic investigation to further assess the suspicious activity on TMS.  As part of the

8  investigation, the vendor analyzed RMI's logs and forensic images and deployed endpoint

9  software to capture IP addresses and other pertinent information.

10      **ANSWER**: **Defendants lack knowledge regarding the allegations in this paragraph and**

11  **therefore are unable to admit or deny.  To the extent a response is required, deny.**

12      27.    RMI discovered through this investigation that there were logins to TMS from

13  more than 200 IP addresses owned by AWS from November 1, 2020, to November 3, 2020.

14      **ANSWER**: **Defendants lack knowledge regarding the allegations in this paragraph and**

15  **therefore are unable to admit or deny.  To the extent a response is required, deny.**

16      28.    RMI also discovered that another series of unexplained logins to TMS and Data

17  downloads occurred from other AWS-owned IP addresses and at least 23 IP addresses owned

18  by conventional Internet service providers well before it detected the unusual activity in

19  November 2020.  IP addresses that logged into TMS from locations in Washington were

20  responsible for much of the suspicious activity.

21      **ANSWER**: **Defendants lack knowledge regarding the allegations in this paragraph and**

22  **therefore are unable to admit or deny.  To the extent a response is required, deny.**

23  *AWS Subpoena and Confidential Information on Cedar's Website*

24      29.    RMI moved for expedited discovery at the same time it filed the original

25  complaint.  After the Court granted that motion, RMI served AWS with a subpoena requesting

26  information to identify the individuals responsible for the suspicious logins and downloads.  In

27

1  particular, RMI asked that AWS identify the persons associated with the 20 unique IP addresses

2  that were most active during the peak of the suspicious activity and Data downloads.

3      **ANSWER: Defendants lack knowledge regarding the allegations in this paragraph and**

4  **therefore are unable to admit or deny.  To the extent a response is required, deny.**

5      30.    AWS responded to the subpoena on June 10, 2021, providing the account

6  registration information associated with the 20 IP addresses RMI identified.

7      **ANSWER: Defendants lack knowledge regarding the allegations in this paragraph and**

8  **therefore are unable to admit or deny.  To the extent a response is required, deny.**

9      31.    AWS's response confirms, as RMI had suspected, that Cedar owns the IP

10  addresses that accessed TMS and downloaded Data during the suspicious activity RMI detected.

11  The response also indicated that the related account is registered to Vilhena, and Ponticello is

12  listed as the billing contact for the account.

13      **ANSWER: Defendants admit only that they have an account with AWS that is**

14  **registered to Defendant Vilhena and for which Defendant Ponticello is listed as the billing**

15  **contact.  Defendants deny there was anything suspicious about the activity RMI detected.**

16  **Defendants affirmatively allege that RMI's allegation that it suspected Cedar owned the IP**

17  **addresses is disingenuous; RMI knew that Cedar was accessing snapshot feeds from the**

18  **external FTP server for certain railroads because RMI had authorized it.  Defendants lack**

19  **knowledge regarding the remaining allegations in this paragraph and therefore are unable to**

20  **admit or deny.  To the extent a response is required, deny.**

21      32.    While waiting for information from AWS, RMI obtained additional proof that

22  Cedar accessed TMS without permission.  In May of this year, Cedar posted a graphic to its

23  website that depicted a TMS database.  As shown below, the "User" Cedar identified on the

24  picture is "RMIJET," which is an authentic and unique TMS user identification for one of RMI's

25  current employees.  The only way Cedar would have this confidential information is if it

26  accessed TMS.

27

1    **ANSWER: Defendants admit only that Cedar copied the graphic from a publicly**

2    **available image that was posted on RMI's support website.  Defendants deny Cedar**

3    **improperly accessed what RMI has described as "an authentic and unique TMS user**

4    **identification for one of RMI's current employees." Defendants further deny Cedar accessed**

5    **snapshot feeds for certain railroads without permission and affirmatively allege that RMI not**

6    **only knew that Cedar was accessing such feeds, but authorized Cedar's access.  Defendants**

7    **lack knowledge regarding the remaining allegations in this paragraph and therefore are**

8    **unable to admit or deny.  To the extent a response is required, deny.**

9          *Defendants Were On Notice They Had No Authority to Access TMS*

10    33.    As noted above, on March 31, 2020, RMI sent a letter to Ponticello and Vilhena,

11    putting them personally, along with Cedar, on notice of RMI's "strong concerns about the

12    potential misuse of Wabtec confidential and proprietary data." Ponticello denied any

13    wrongdoing by Cedar.  In an April 14, 2020 letter, he stated that, "to our knowledge," Cedar did

14    not have "access to any of [RMI's] confidential and proprietary data."

15    **ANSWER: Admit.**

16    34.    Despite Ponticello's claim, on information and belief, Defendants had been

17    accessing TMS to download Data at or about the time Ponticello told RMI that Cedar did not

18    have access to RMI's proprietary data.  Ponticello's statement is contradicted by the

19    information AWS provided showing that it assigned Cedar the IP addresses for the devices used

20    to access TMS and download Data during the unusual activity RMI detected.

21    **ANSWER: Defendants admit only that Cedar accessed snapshot data files pertaining to**

22    **certain railroads held on an external FTP server, with RMI's authorization.  Defendants deny**

23    **they ever accessed RMI's internal TMS system.  Defendants affirmatively allege that the**

24    **snapshots did not contain any of RMI's proprietary data.  Defendants lack knowledge**

25    **regarding the remaining allegations in this paragraph and therefore are unable to admit or**

26    **deny.  To the extent a response is required, deny.**

27

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 11
Case No. 2:21-cv-00437-TSZ

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

*Defendants' Improper Use of RMI's Data to Compete with RMI*

35.     Cedar and the individual Defendants used the Data they stole via their unauthorized access to TMS to unfairly compete with and disparage RMI.  One example of Data in TMS that provide Defendants a significant competitive advantage is the "car hire" data that RMI creates from several raw data sources.  Car hire is the rental amount that railroads pay to equipment owners.  This is valuable trade secret Data that Cedar could have used to help rail operators drive efficiencies by prioritizing the return of higher-priced equipment over lower-cost items and to gain other competitive advantages.

**ANSWER:  Defendants deny that they stole data via unauthorized access to TMS and further deny that they have competed unfairly with or disparaged RMI.  Defendants deny that they had access to the "car hire" data described in this paragraph as "car hire" data is not included in the snapshot inventory data.  Defendants affirmatively allege that the information contained in the snapshot data feeds was not trade secret information and could not give Defendants any competitive advantage over RMI because it consisted of standard EDI fields that every railroad uses to track railcar inventory.  Defendants deny the remaining allegations in this paragraph.**

36.     Cedar's main marketing tool to solicit RMI's customers is a software demonstration that compares its transportation management system to TMS.  On information and belief, while attempting to compete with RMI, Cedar relied on Data it took from RMI, such as the car hire data, to give it a major competitive advantage in the demonstrations.

**ANSWER: Defendants deny the allegations in this paragraph and affirmatively allege that the information contained in the snapshot data feeds was not trade secret information and could not give Defendants any competitive advantage over RMI because it consisted of standard EDI fields that every railroad uses to track railcar inventory.  Defendants deny that they had access to the "car hire" data described in this paragraph as "car hire" data is not included in the snapshot inventory data.**

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    37.    RMI has lost at least 15 TMS customer accounts because of Cedar's unlawful and

2    dishonest conduct, resulting in multimillion-dollar losses to RMI.

3    **ANSWER: Defendants lack knowledge regarding the remaining allegations in this**

4    **paragraph and therefore are unable to admit or deny.  To the extent a response is required,**

5    **deny.**

6                                        **FIRST CAUSE OF ACTION**

7            **Violation of Computer Fraud and Abuse Act (18 U.S.C. § 1030)**

8    38.    RMI re-alleges and incorporates by reference paragraphs 1 through 37 above.

9    **ANSWER: This paragraph consists of statements to which no response is required.  To**

10   **the extent a response is required, deny.**

11   39.    TMS is a "protected computer" within the meaning of 18 U.S.C. § 1030(e) as RMI

12   and its customers use the system in affecting domestic or foreign commerce or communication.

13   **ANSWER: This paragraph consists of legal conclusions to which no response is**

14   **required.  To the extent a response is required, deny.**

15   40.    On information and belief, Cedar, at the direction of Ponticello and Vilhena, and

16   in violation of 18 U.S.C. § 1030(a), intentionally accessed TMS without authorization.  As

17   described above, on or around November 2020, RMI discovered highly unusual activity on TMS.

18   RMI promptly launched an investigation into the activity and identified the IP addresses

19   connected to the unusual activity.  RMI learned that AWS owned those IP addresses, so RMI

20   sought and received expedited discovery from AWS to obtain information about the persons

21   assigned the IP addresses in question.

22   **ANSWER: Defendants deny they violated 18 U.S.C. § 1030(a) or intentionally accessed**

23   **TMS without authorization.  Defendants lack knowledge regarding the remaining allegations**

24   **in this paragraph and therefore are unable to admit or deny.  To the extent a response is**

25   **required, deny.**

26   41.    AWS's subpoena response conclusively demonstrated that the IP addresses for

27   the devices used to access TMS without authorization were assigned to Cedar, registered to

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 13
Case No. 2:21-cv-00437-TSZ

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1   Vilhena, and billed to Ponticello.  Also, Defendants accessed TMS without permission because it

2   posted a graphic to its website containing a confidential TMS user identification ("RMIJET") that

3   it could have only obtained from the system.

4          **ANSWER: Defendants admit only that Cedar accessed snapshot data files pertaining to**

5   **certain railroads held on an external FTP server, with RMI's authorization, and that Cedar**

6   **copied a graphic from a publicly available image that was posted on RMI's support website.**

7   **Defendants deny they ever accessed RMI's internal TMS system, and further deny they**

8   **improperly accessed the graphic "containing a confidential TMS user identification**

9   **('RMIJET')." Defendants lack knowledge regarding the remaining allegations in this paragraph**

10  **and therefore are unable to admit or deny.  To the extent a response is required, deny.**

11         42.     Moreover, Defendants' actions were intentional.  Indeed, Cedar knew it was

12  barred from accessing the Data without RMI's permission because RMI raised concerns to

13  Ponticello and Vilhena about Cedar's "potential misuse of [RMI's] confidential and proprietary

14  data" and demanded that Cedar immediately destroy "any such data" in its possession.  Also,

15  Defendants ignored the conspicuous notice on TMS that advises those entering the system that

16  "[a]ccess or use of this system is strictly limited to persons having express authorization from

17  RMI."

18         **ANSWER: Deny.**

19         43.     Defendants' actions caused RMI damage during a one-year period aggregating at

20  least $5,000.00.  Indeed, in the wake of Defendants' unauthorized access to TMS, RMI has

21  suffered multimillion-dollar business losses.

22         **ANSWER: Deny.**

23                           **SECOND CAUSE OF ACTION**

24           **Violation of Stored Communications Act (18 U.S.C. § 2701)**

25         44.     RMI re-alleges and incorporates by reference paragraphs 1 through 43 above.

26         **ANSWER: This paragraph consists of statements to which no response is required.  To**

27  **the extent a response is required, deny.**

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 14
Case No. 2:21-cv-00437-TSZ

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 ● FAX 206.319.5450
www.terrellmarshall.com

1    45.    TMS is an "electronic communication service" within the meaning of 18 U.S.C. §

2    2701(a) because, among other reasons, it provides users the ability to send or receive Data in

3    interstate commerce.

4    **ANSWER: This paragraph consists of legal conclusions to which no response is**

5    **required.  To the extent a response is required, deny.**

6    46.    As explained above, *supra* at 40, Cedar, acting, on information and belief, at the

7    direction of Ponticello and Vilhena, and in violation of 18 U.S.C. § 2701, knowingly or

8    intentionally accessed TMS without authorization.

9    **ANSWER: This paragraph consists of legal conclusions to which no response is**

10    **required.  To the extent a response is required, deny.**

11    47.    RMI's forensic examination after it detected the suspicious activity in November

12    2020 revealed that Defendants used their unauthorized access to TMS to obtain Data while it

13    was contained in electronic storage in TMS.

14    **ANSWER: Deny.**

15    48.    As described above, *supra* at 41, RMI traced the unauthorized access to

16    Defendants.  Cedar's website further shows that Defendants accessed TMS without

17    authorization as it displays a graphic containing confidential information.

18    **ANSWER: Defendants admit Cedar accessed snapshot data files pertaining to certain**

19    **railroads held on an external FTP server, with RMI's authorization, and that Cedar copied a**

20    **graphic from a publicly available image that was posted on RMI's support website.**

21    **Defendants deny the remaining allegations in this paragraph.**

22    49.    RMI has suffered actual harm due to Defendants' unlawful and dishonest

23    conduct, including multimillion dollars in lost business.

24    **ANSWER: Deny.**

25    **THIRD CAUSE OF ACTION**

26    **Trade Secret Misappropriation Under Defend Trade Secrets Act (18 U.S.C. § 1836)**

27    50.    RMI re-alleges and incorporates by reference paragraphs 1 through 49 above.

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 15
Case No. 2:21-cv-00437-TSZ

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  **ANSWER: This paragraph consists of statements to which no response is required.  To**

2  **the extent a response is required, deny.**

3  51.  RMI has developed and owns confidential, proprietary, and trade secret

4  information contained in TMS, including financial, business, scientific, technical, economic, or

5  engineering information such as the Data, and the login credentials that provide access to the

6  Data.  This information relates to products or services used in, or intended for use in interstate

7  commerce, as RMI's rail customers across the country use TMS.

8  **ANSWER: Defendants lack knowledge regarding the allegations in this paragraph and**

9  **therefore are unable to admit or deny.  To the extent a response is required, deny.**

10  52.  The confidential, proprietary, and trade secret information in TMS is valuable as

11  it is unknown to others.  RMI has implemented access restrictions to protect the information,

12  including requiring users to register on TMS, providing unique login credentials for each

13  customer, and notifying anyone entering TMS that "[a]ccess or use of this system is strictly

14  limited to persons having express authorization from RMI." RMI has expended significant

15  resources and effort to develop TMS, the confidential, proprietary, and trade secret

16  information contained in the system, and the access control systems that protect TMS from

17  unauthorized intrusion.

18  **ANSWER: Defendants deny that all of the information contained in TMS is**

19  **confidential, proprietary or trade secret information.  Defendants deny that the information**

20  **in TMS is valuable because it is unknown to others because inventory data is shared among**

21  **different railroads in order to track railcar shipments.  Defendants lack knowledge regarding**

22  **the remaining allegations in this paragraph and therefore are unable to admit or deny.  To the**

23  **extent a response is required, deny.**

24  53.  The confidential, proprietary, and trade secret information included in TMS

25  derives independent economic value from not being generally known to and not being readily

26  ascertainable through proper means by another person who could obtain economic value from

27

1  disclosing or using the information.  The information at hand has tremendous value to

2  Defendants in their effort to solicit RMI's customers and develop a client base.

3  **ANSWER: Defendants deny that all of the information contained in TMS is**

4  **confidential, proprietary or trade secret information.  Defendants deny that the information**

5  **in TMS derives independent economic value from not being generally known to and not being**

6  **readily ascertainable through proper means by another person who could obtain economic**

7  **value from disclosing or using the information because inventory data is shared among**

8  **different railroads in order to track railcar shipments.  Defendants deny the remaining**

9  **allegations in this paragraph.**

10  54.    All of RMI's rail customers that use TMS are contractually obligated to maintain

11  the secrecy of their TMS login credentials and other confidential and trade secret information

12  that is contained in or provides access to the system.  Also, RMI's employees are required to

13  keep the company's proprietary and trade secret information confidential.

14  **ANSWER: Defendants lack knowledge regarding the allegations in this paragraph and**

15  **therefore are unable to admit or deny.  To the extent a response is required, deny.**

16  55.    In violation of RMI's rights under the Defend Trade Secrets Act, 18 U.S.C. § 1836

17  et seq., Cedar, acting, on information and belief, at the direction of Ponticello and Vilhena,

18  misappropriated the confidential, proprietary, and trade secret information contained in TMS

19  as described above.

20  **ANSWER: This paragraph consists of legal conclusions to which no response is**

21  **required.  To the extent a response is required, deny.**

22  56.    Defendants misappropriated the confidential, proprietary, and trade secret

23  information contained in TMS knowing or having reason to know that it was acquired by

24  improper means.  Also, when they obtained and used the information, Defendants knew or had

25  reason to know their knowledge of RMI's trade secrets was derived from or through a person

26  who had utilized improper means to acquire it, acquired it under circumstances giving rise to a

27  duty to maintain its secrecy or limit its use or derived it from or through a person who owed a

1 | duty to RMI to maintain its secrecy or limit its use.  That Defendants continued to

2 | misappropriate the information after Ponticello claimed Cedar did not have "access to any of

3 | [RMI's] confidential and proprietary data" shows that Defendants' acts are willful and rise to

4 | the level of maliciousness appropriate for exemplary and punitive damages, including

5 | attorney's fees.

6 |      **ANSWER: Deny.**

7 |      57.    As a result of Defendants' misappropriation of the confidential, proprietary, and

8 | trade secret information included in TMS, RMI has suffered actual damages in an amount to be

9 | proven at trial.  At a minimum, Defendants have gained an improper competitive advantage

10 | over RMI because they have accessed and used RMI's proprietary information to solicit RMI's

11 | customers, all without having invested the time, funds, and resources to develop the

12 | information.

13 |      **ANSWER: Deny.**

14 |      58.    Defendants' ongoing and continuing use of RMI's trade secrets and proprietary

15 | and confidential information has caused, and will cause, RMI repeated and irreparable injury.

16 | RMI's remedy at law is not, by itself, adequate to compensate for the injuries already inflicted

17 | and further threatened.  RMI is also entitled to damages for unjust enrichment resulting from

18 | Defendants' misappropriation of the trade secrets that are not addressed in computing

19 | damages for actual loss.  Defendants have unjustly enriched themselves from RMI's information

20 | because they have not invested anything in acquiring or curating the information.

21 |      **ANSWER: Deny.**

22 |      **FOURTH CAUSE OF ACTION**

23 |      **Trade Secret Misappropriation under Wash. Rev. Stat. § 19.108.010**

24 |      59.    RMI re-alleges and incorporates by reference paragraphs 1 through 58 above.

25 |      **ANSWER: This paragraph consists of statements to which no response is required.  To**

26 | **the extent a response is required, deny.**

27 |

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 18
Case No. 2:21-cv-00437-TSZ

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

60.     As explained above, *supra* at 52-53, RMI has developed and owns confidential, proprietary, and trade secret information, including the Data, and the login credentials that provide access to the Data.

**ANSWER: Defendants lack knowledge regarding the allegations in this paragraph and therefore are unable to admit or deny.  To the extent a response is required, deny.**

61.     As explained above, *supra* at 54, RMI has taken reasonable measures to keep such information secret.  Also, RMI's trade secret information derives independent economic value by not being generally known to and not being readily ascertainable through proper means by another person who could obtain economic value from disclosing or using the information.

**ANSWER: Defendants lack knowledge regarding the allegations in this paragraph and therefore are unable to admit or deny.  To the extent a response is required, deny.**

62.     In violation of Plaintiff's rights under the Washington Uniform Trade Secrets Act, Wash. Rev. Code § 19.108.010 et seq., Cedar, acting, on information and belief, at the direction of Ponticello and Vilhena, misappropriated the confidential, proprietary, and trade secret information described above.  *Supra* 55-56.

**ANSWER: This paragraph consists of legal conclusions to which no response is required.  To the extent a response is required, deny.**

63.     Defendants' unlawful conduct involved the misappropriation of RMI's trade secret information knowing or having reason to know that it was acquired by improper means. Furthermore, at the time they obtained and used RMI's trade secret information, Defendants knew or had reason to know their knowledge of RMI's trade secrets was derived from or through a person who had utilized improper means to acquire it, acquired it under circumstances giving rise to a duty to maintain its secrecy or limit its use or derived it from or through a person who owed a duty to RMI to maintain its secrecy or limit its use.

**ANSWER: Deny.**

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    64.    Defendants' conduct was intentional, knowing, willful, malicious, fraudulent, and

2    oppressive.  As a direct and proximate result of their conduct, RMI has suffered and will

3    continue to suffer irreparable financial loss, loss of goodwill, and irreparable loss of the

4    confidentiality of its proprietary and trade secret information, for which there is no adequate

5    remedy at law.

6        **ANSWER: Deny.**

7    65.    RMI has suffered substantial damages as a direct and proximate result of

8    Defendants' conduct in an amount to be proven at trial.  Defendants have also been unjustly

9    enriched by their misappropriation of RMI's trade secrets in an amount to be proven at trial.

10        **ANSWER: Deny.**

11                **FIFTH CAUSE OF ACTION**

12            **Unfair Competition under Wash. Rev. Stat. § 19.86.020**

13    66.    RMI re-alleges and incorporates by reference paragraphs 1 through 65 above.

14        **ANSWER: This paragraph consists of statements to which no response is required.  To**

15    **the extent a response is required, deny.**

16    67.    Defendants' unlawful acts constitute unfair competition under Wash. Rev. Stat. §

17    19.86.020 because Cedar, acting at the direction of Ponticello and Vilhena, engaged in unfair

18    methods of competition and deceptive acts in the conduct of trade or commerce.

19        **ANSWER: This paragraph consists of legal conclusions to which no response is**

20    **required.  To the extent a response is required, deny.**

21    68.    Defendants' unfair methods of competition include, but are not limited to,

22    accessing TMS without RMI's consent; improperly downloading confidential Data; and

23    improperly using the Data to compete against and disparage RMI.  On information and belief,

24    Cedar also used the Data it stole from TMS to perform demonstrations for RMI's customers.

25        **ANSWER: Deny.**

26

27

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 20
Case No. 2:21-cv-00437-TSZ

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    69.    The public is interested in the subject matter of this dispute because, among

2    other reasons, Defendants committed the acts alleged here in the course of their business in

3    Washington.

4    **ANSWER: Deny.**

5    70.    RMI was injured in its business or property by Defendants' violation of Wash.

6    Rev. Stat. § 19.86.020, including suffering multimillion-dollar losses in business.

7    **ANSWER: Deny.**

8                                **SIXTH CAUSE OF ACTION**

9                        **Tortious Interference with Business Relationships**

10    71.    RMI re-alleges and incorporates by reference paragraphs 1 through 70 above.

11    **ANSWER: This paragraph consists of statements to which no response is required.  To**

12    **the extent a response is required, deny.**

13    72.    RMI had a legitimate business relationship with its customers and reasonable

14    business expectations derived from those relationships.

15    **ANSWER: Defendants lack knowledge regarding the allegations in this paragraph and**

16    **therefore are unable to admit or deny.  To the extent a response is required, deny.**

17    73.    On information and belief, Defendants knew about RMI's business relationships

18    because, among other things, Cedar hired former Wabtec employees familiar with RMI's

19    customer base for TMS.

20    **ANSWER: Deny.**

21    74.    On information and belief, Cedar, acting at the direction of Ponticello and

22    Vilhena, intentionally interfered with numerous RMI business relationships for an improper

23    purpose or using improper means, thereby causing termination of those relationships.

24    **ANSWER: Deny.**

25    75.    As described above, Defendants improperly used the Data to compete against

26    and disparage RMI.  Again, on information and belief, Cedar used the downloaded Data that it

27    stole from TMS to perform demonstrations in an attempt to solicit RMI's customers.

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 21
Case No. 2:21-cv-00437-TSZ

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    **ANSWER: Deny.**

2    76.    Defendants' wrongful conduct has significantly harmed RMI.  To date, RMI has

3    lost at least 15 customer accounts, representing multimillion-dollar losses in business.

4    **ANSWER: Deny.**

5    **SEVENTH CAUSE OF ACTION**

6    **Unjust Enrichment**

7    77.    RMI re-alleges and incorporates by reference paragraphs 1 through 76 above.

8    **ANSWER: This paragraph consists of statements to which no response is required.  To**

9    **the extent a response is required, deny.**

10    78.    As described above, Cedar, acting, on information and belief, at the direction of

11    Ponticello and Vilhena, accessed TMS without RMI's authorization and improperly downloaded

12    confidential and proprietary Data.  Defendants are using that improperly obtained Data to

13    compete against and disparage RMI.  Defendants have received a benefit from that wrongful

14    conduct at RMI's expense.  For example, to date, Defendants have been successful in luring

15    away some of RMI's customers.  Under the circumstances, and based on the unauthorized,

16    unlawful, and improper nature of Defendants' conduct, it is unjust for Defendants to retain the

17    benefit of business it has misappropriated from RMI without payment to RMI.

18    **ANSWER: Deny.**

19    79.    There is no justification for Defendants' enrichment at the expense of RMI's

20    substantial losses.

21    **ANSWER: Deny.**

22    **PRAYER FOR RELIEF**

23    WHEREFORE, RMI prays for:

24    80.    Compensatory damages for losses sustained due to Defendants' improper

25    conduct;

26    81.    Exemplary and punitive damages per 18 U.S.C. §§ 1836(b)(3)(C), 2707(c), or any

27    other cause of action stated here that permits the recovery of such damages.

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 22
Case No. 2:21-cv-00437-TSZ

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

82.     Preliminary and permanent relief enjoining Defendants from accessing, using, disclosing, or benefitting directly or indirectly from TMS and the Data and from soliciting, attempting to solicit, or doing business with any of RMI's rail customers;

83.     An order that directs Defendants to (a) return to all RMI confidential information in its possession, (b) disclose all persons or entities to which it disclosed confidential information and who disclosed it, and (c) destroy all Data and other information obtained from TMS;

84.     A judgment that Defendants violated the Computer Fraud and Abuse Act and Stored Communications Act, and that it unfairly competed with RMI, tortiously interfered with RMI's business relationships, and was unjustly enriched at RMI's expense;

85.     Reasonable attorneys' fees and costs under 18 U.S.C. §§ 1836(b)(3)(D), 2707(b)(3), or any other cause of action stated here that permits the recovery of these expenses.

86.     Pre- and post-judgment interest; and

87.     Such other and further relief as the Court deems just and proper.

**ANSWER: Defendants deny that Plaintiff is entitled to any of the relief sought in the Amended Complaint.**

**JURY DEMAND**

88.     RMI demands a jury trial in this action.

**AFFIRMATIVE DEFENSES**

Without assuming any burden of pleading or proof that would otherwise rest on Plaintiff, and reserving the right to amend this Answer to assert any additional defenses when, and if, in the course of its investigation, discovery, preparation for trial, or otherwise, it becomes appropriate to assert such defenses, Defendants allege the following affirmative defenses.

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 23
Case No. 2:21-cv-00437-TSZ

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  **FIRST AFFIRMATIVE DEFENSE – FAILURE TO STATE A CLAIM**

2  Plaintiff fails to state a claim upon which relief can be granted.

3  **SECOND AFFIRMATIVE DEFENSE – UNJUST ENRICHMENT**

4  Defendants allege that granting Plaintiff's demand in the Amended Complaint would

5  result inunjust enrichment.

6  **THIRD AFFIRMATIVE DEFENSE – UNCLEAN HANDS**

7  Plaintiff's claims are barred under the doctrine of unclean hands.

8  **FOURTH AFFIRMATIVE DEFENSE – EQUITABLE ESTOPPEL**

9  Plaintiff's claims are barred under the doctrine of equitable estoppel.

10  **FIFTH AFFIRMATIVE DEFENSE – LACHES**

11  Plaintiff's claims are barred under the doctrine of laches.

12  **SIXTH AFFIRMATIVE DEFENSE – ABUSE OF PROCESS**

13  Plaintiff's claims are an abuse of process, being pursued for an improper purpose.

14  **RESERVATION OF RIGHTS**

15  Defendants reserve the right to assert additional affirmative defenses as they become

16  available.

17  **DEMAND FOR JURY TRIAL**

18  Defendants hereby demand a jury trial on all matters so triable as of right.

19  **COUNTERCLAIM AND THIRD-PARTY COMPLAINT**

20  Defendant and Counterclaim Plaintiff Cedar AI, Inc. ("Cedar") brings claims against

21  Plaintiff and Counterclaim Defendant Railcar Management, LLC ("RMI"), and Third-Party

22  Defendants GE Transportation ("GE") and Wabtec Corporation ("Wabtec") as follows:

23  **I.      PARTIES**

24  1.      Cedar is a technology startup company dedicated to providing the rail industry

25  with state-of-the-art yard operating, planning, and management software.  Cedar is

26  incorporated under the laws of Delaware and has its principal place of business in Seattle,

27  Washington.

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

2.      On information and belief, RMI is a limited liability company formed under the laws of the state of Georgia.  Its principal place of business is located in Atlanta, Georgia.  RMI was a subsidiary of GE from January 2012 to February 2019, and became a subsidiary of Wabtec after GE merged with Wabtec in February 2019.

3.      On information and belief, GE, formerly known as GE Rail, is headquartered in Pittsburgh, Pennsylvania.  It was owned by General Electric until it was sold to Wabtec in February 2019 and is now a division of Wabtec.

4.      Wabtec is a global provider of equipment, components, software, services, and systems for the transportation industry.  Wabtec is incorporated under the laws of Delaware and has a principal place of business in Pittsburgh, Pennsylvania.  Wabtec acquired RMI via its merger with GE in February 2019.

5.      RMI as defined herein includes GE and Wabtec during the relevant time periods of ownership by those respective entities.

6.      On information and belief, Wabtec operates as RMI's and GE's alter ego and there is such a unity of ownership and interest between RMI, GE, and Wabtec that the separateness of these corporate entities, if any, has ceased to exist.  For example, there is unity of ownership because Wabtec owns both RMI and GE.  Neither GE nor RMI appear to have separate employees and, on information and belief, RMI's main asset, RailConnect, has been transferred to Wabtec.  RMI, GE, and Wabtec have disregarded any distinction between the corporate entities by allowing Wabtec to act on RMI's and GE's behalf throughout the relevant time frame during the respective periods of ownership, including in business interactions with Cedar.

## II.      JURISDICTION AND VENUE

7.      Counterclaim and Third-Party Defendants RMI, GE, and Wabtec are within the jurisdiction of this Court.  Cedar's counter- and third-party- claims arise under Section 2 of the Sherman Act (15 U.S.C. § 2), Section 4 of the Clayton Act (15 U.S.C. § 15(a)), and Section 16 of the Clayton Act (15 U.S.C. § 26).  Cedar seeks damages for its injuries resulting from RMI, GE,

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 25
Case No. 2:21-cv-00437-TSZ

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  and Wabtec's tortious and anti-competitive conduct.  Cedar also seeks an injunction to prohibit

2  RMI, GE, and Wabtec from continuing their unlawful conduct.  This Court has subject matter

3  jurisdiction under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1332 (in that there is diversity

4  of citizenship between the parties and the amount placed in controversy by each of the claims

5  for relief herein exceeds $75,000, exclusive of interests, costs and attorneys' fees), 28 U.S.C.

6  § 1337(a) (antitrust), and 15 U.S.C. § 15 (antitrust).  This Court also has jurisdiction over Cedar's

7  state law claims pursuant to 28 U.S.C. § 1367 because such state law claims are related to, and

8  form part of, the same case or controversy.

9      8.      Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial

10  portion of the acts alleged herein took place in this district and RMI, GE, and Wabtec carry out

11  interstate trade and commerce in this district.  Venue also is appropriate in this district under

12  Section 12 of the Clayton Act, 15 U.S.C. § 22 (nationwide venue for antitrust matters).  Further,

13  venue is proper in this district because RMI sued Cedar in this judicial district on the basis of

14  RMI's Transportation Management System ("TMS"), which is the subject of Cedar's

15  Counterclaim and Third-Party Complaint.

16                          **III.      NATURE OF THE ACTION**

17      9.      Cedar was founded in 2017 to develop Optiswitch, an innovative yard

18  optimization tool for shortline railroads that leverages artificial intelligence.

19      10.      Optiswitch relies on inventory data from Transportation Management Systems

20  ("TMSs") in order to operate.  A TMS is a railcar inventory management system used by

21  railroads to automate their daily operations.

22      11.      Shortline railroads are Class II and Class III railroads with reporting marks, as

23  defined by the Surface Transportation Board of the United States ("STB").  Shortline railroads

24  are distinct from Class I railroads, such as BNSF Railway Company and Norfolk Southern, as well

25  as from third-party switchers, which move railcars within a rail yard, but not longer distances.

26

27

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 26
Case No. 2:21-cv-00437-TSZ

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 ● FAX 206.319.5450
www.terrellmarshall.com

1    12.    RMI is the dominant TMS provider for shortline railroads in the United States.

2  However, over the course of approximately the last 15 years, RMI has allowed its TMS product,

3  RailConnect, and its customer service to languish.

4    13.    Rather than innovate or improve its services, RMI has engaged in a campaign of

5  anticompetitive conduct in order to maintain its dominant position and stifle competition from

6  the only two major vendors who have attempted to compete with it.  In 2016, RMI acquired its

7  only meaningful existing competitor, ShipXpress, and shortly thereafter terminated ShipXpress'

8  TMS product, Command.  When Cedar launched a competing, innovative, cost-effective TMS

9  product in 2020, RMI initiated an aggressive campaign to lock up shortline railroad customers in

10 new multi-year contracts, thereby foreclosing them from switching to Cedar's new product.

11 RMI purposefully timed its actions to sabotage Cedar's launch of its competing product and to

12 put Cedar out of business.  RMI has also tried on numerous occasions to acquire Cedar, just as it

13 did ShipXpress.  RMI has now filed a baseless lawsuit against Cedar with the intent of interfering

14 with Cedar's business and eliminating RMI's only real competitor in the Shortline Railroad TMS

15 Market (as defined in paragraphs 80-83 below).

16    14.    Cedar's Counterclaim and Third-Party Complaint arises from RMI, GE, and

17 Wabtec's pattern of unfair, unlawful, and anticompetitive actions against its competitors in the

18 Shortline Railroad TMS Market, including but not limited to Cedar.  Upon information and

19 belief, and as described below, RMI, GE, and Wabtec's intentional conduct has severely harmed

20 competition, and will continue to cause injury to current and potential future competitors and

21 customers by substantially foreclosing competition in the Shortline Railroad TMS Market.

22                    **IV.    FACTUAL ALLEGATIONS**

23 **A.    TMS Products Are the Backbone of a Shortline Railroad's Business and RMI Is the**
   **Dominant TMS Provider for Shortline Railroads Despite Antiquated Technology, Poor**
24 **Customer Service, and High Prices**

25    15.    A TMS is a railcar inventory management system used by railroads to automate

26 their daily operations.  A TMS tracks rail car events, movements, and rail tracks; calculates

27 revenue owed to the railroad; handles invoicing; and provides business intelligence.  Shortline

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 27
Case No. 2:21-cv-00437-TSZ

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1   railroads send and receive all of their electronic data interchange ("EDI") messages to and from

2   other railroads via their TMS.  Without the ability to send and receive EDI, a shortline railroad

3   has no way of knowing which trains are coming and going from its rail yards or what to do with

4   the railcars once they arrive.  Thus, a shortline railroad is unable to function without a TMS.[1]

5       16.     RMI is the dominant TMS provider for shortline railroads in the United States.

6   RMI introduced the first major shortline TMS, RailConnect, in 1992.

7       17.     On information and belief, RMI has over an 80% share of the market for TMS

8   products for shortline railroads in the United States (the "Shortline Railroad TMS Market").

9   In March 2018, Jen Schopfer, Vice President of GE's Transport Logistics division (RMI's parent

10  company until February 2019), described RMI's customer base as "virtually all" shortline

11  railroads in the United States.[2]

12      18.     RMI's current parent company, Wabtec, is a global corporation with over 100

13  subsidiaries, 27,000 employees in 50 countries, net sales of $8.2 billion in 2019, and a market

14  capitalization value of over $16 billion.[3]

15      19.     RailConnect was originally developed in 1992 using a "green screen" interface,

16  which relies on manually entered commands, similar to MS-DOS.  Over the years, RMI

17  attempted to graft more user-friendly interfaces onto RailConnect's 1992-vintage software

18  without success.

19      20.     RailConnect has become an outdated product, as RMI has failed to update its

20  software to meet customer demands.  RMI's customers have also complained that its customer

21  service has deteriorated over time.[4]

22      21.     Customers have long wanted an alternative to RailConnect because it is

23  outdated, difficult to use, and overpriced.  In 2015, GE created a Customer Advisory Board in

24  ─────────────────

25  [1] *See* **Exhibit 1** (McCrory Declaration) ¶ 30; **Exhibit 2** (Mahlandt Declaration) ¶ 3.

    [2] Daniel Niepow, *Short Lines Band Together to Leverage Big Data*, PROGRESSIVE RAILROADING (March 15, 2018),

26  https://www.progressiverailroading.com/internet-digital/article/Short-lines-band-together-to-leverage-Big-Data--54114.

    [3] *See* Wabtec Corporation, Annual Report (Form 10-K) (Feb. 19, 2021), https://ir.wabteccorp.com/static-

27  files/45820bca-d006-48f0-b02f-6112e1ba8932.

    [4] *See* **Exhibit 1** (McCrory Declaration) ¶ 28; **Exhibit 3** (Evans Declaration) ¶¶ 5-7.

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 28
Case No. 2:21-cv-00437-TSZ

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    response to complaints from shortline railroad customers who were dissatisfied with

2    RailConnect.[5]  However, RMI has not delivered requested changes or updates to RailConnect

3    under either GE or Wabtec ownership.

4        22.      Shortline railroads measure efficiency by analyzing metrics like railcar dwell time,

5    or the amount of time a railcar sits in the yard, and the overall number of railcars the yards are

6    able to process.  The more railcars that move through, the more revenue the yard makes.[6]

7    Shortline railroads cannot maintain, much less improve, efficiency without innovative TMS

8    technology and competent customer service.

9    **B.    RMI Acquired and Eliminated its Only Meaningful Competitor in the Shortline Railroad**
     **TMS Market**

10

11        23.      Before Cedar existed, RMI's only meaningful competitor was ShipXpress, which

12    gained a foothold in the Shortline Railroad TMS Market in the 2010s by offering a less

13    expensive alternative TMS product called Command.[7]  Between 2010 and 2016, ShipXpress

14    gained approximately 100 shortline railroad customers for Command.  On information and

15    belief, Command cost roughly half as much as RMI's RailConnect TMS product.

16        24.      Rather than compete with ShipXpress, RMI decided to squelch the competition

17    by acquiring ShipXpress in 2016.  After the acquisition, on information and belief, RMI raised

18    the price of Command, and allowed the product and customer service to deteriorate.

19        25.      After Wabtec acquired RMI, it announced in late 2019 or early 2020 that it would

20    discontinue Command and told Command customers their only option was to switch to RMI's

21    RailConnect.[8]

22    **C.    Cedar's Founders Designed Optiswitch to Integrate with TMS Software**

23        26.      Mario Ponticello and Daril Vilhena founded Cedar in 2017 to build Optiswitch, a

24    yard optimization tool for shortline railroads.  Optiswitch utilizes artificial intelligence to analyze

25

---

26    [5] **Exhibit 3** (Evans Declaration) ¶¶ 5-6.
     [6] **Exhibit 1** (McCrory Declaration) ¶ 33.

27    [7] **Exhibit 3** (Evans Declaration) ¶ 8.
     [8] **Exhibit 2** (Mahlandt Declaration) ¶ 8.
     DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
     ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
     COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 29
     Case No. 2:21-cv-00437-TSZ

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1   the inventory in a rail yard and tell operators how to move railcars efficiently, a process that has

2   historically been handled manually with pen and paper.  Optiswitch is not a TMS, but instead an

3   innovative complement to a TMS that can automate inventory and rail yard management.

4        27.     Optiswitch requires up-to-the-minute inventory data to function.  Optiswitch

5   needs to know which cars are on which track, what commodities the cars contain, and where

6   the cars are going to create an efficient switching plan for the yard.  Rail yards receive inventory

7   data from EDI messages sent by other railroads.  EDI messages use standardized fields and

8   codes to maintain data uniformity throughout the railroad industry.  Once received via EDI,

9   inventory data is stored in the railroad's TMS.

10       28.     Optiswitch uses inventory data that has been exported from a TMS into a static

11  source, such as a comma-separated values (CSV) file.  Data exported from a TMS into CSV

12  format is known as a "snapshot" file.  However, exported inventory data becomes obsolete the

13  moment a single rail car moves, so snapshot files have to be produced at regular intervals (e.g.,

14  every five minutes) to keep up with current inventory.

15       29.     At a minimum, Optiswitch requires the following fields to work:  station, track,

16  sequence (order of car on the track), car initial and number, car length, gross weight, load

17  status, STCC (commodity code), and block (block name from the car's trip plan).[9]  These are

18  standard fields used by all railroads in the United States and recognized by every TMS, and are

19  intended to maintain consistency among the shortline railroads.  Optiswitch also allows for

20  additional optional fields that Class I railroads generally have, such as car priority or track

21  distance matrices.

22  **D.    Cedar Marketed Optiswitch with RMI's Permission and Participation**

23       30.     Cedar was eager, and needed, to work cooperatively with RMI due to RMI's

24  dominant share of the Shortline Railroad TMS Market.  In April 2018, Cedar approached RMI

25  about integrating Optiswitch with its TMS product, RailConnect.

26

27

---

[9] *See* **Exhibit 4** (Optiswitch Minimum Interface Specification).

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 30
Case No. 2:21-cv-00437-TSZ

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

31.     Beginning in May 2018, RMI provided access to snapshot data feeds for 15 of Cedar's potential customers.  RMI provided Cedar with unique login credentials to access snapshot data feeds for 15 railroads interested in using Optiswitch in concert with RMI's TMS, RailConnect.  The login credentials provided Cedar access to an external FTP server where RailConnect automatically uploaded and stored the snapshot data files.  The login credentials did not provide Cedar access to RMI's internal servers or the RailConnect TMS program.  Cedar created a program that downloaded each railroad's snapshot data files from the external FTP server at regular intervals and imported the data into Optiswitch.

32.     On May 4, 2018, Steve Murray, Cedar's Executive Vice President, sought "express approval" for an Optiswitch pilot project for RMI customer, Longview Junction Switch Railroad (LVSW), in an email to RMI Customer Success Manager, Larry Cantu:

> [W]e would develop a prototype of [Optiswitch] for LVSW to evaluate.  This process requires an interface from RailConnect of current inventory information.  We have proposed using the snapshot file via ftp, as that's a common interface that other GE Customers [sic] use to feed data to external systems.  I have added a line in the MOU to make sure we're very clear that we will treat RailConnect information, all business processes, and the LVSW data as confidential.[10]

Mr. Cantu responded "[a]s far as we are concerned we do not see any conflict with the proposal."[11]

33.     Following this exchange, Mr. Murray corresponded with Andrew Parker, Senior Director of Technical Product Management at RMI, about the EDI fields needed for the snapshot file.[12]  In a subsequent email including the customer, LVSW, Mr. Murray explained: "What we're talking about below with Andrew is simply a data feed, basically a switch list; I don't need or want access to TMS for that."[13]

---

[10] *See* **Exhibit 5** (May 4, 2018 email RE: Cedar AI MOU with LVSW).
[11] *See* **Exhibit 5** (May 4, 2018 email RE: Cedar AI MOU with LVSW).
[12] *See* **Exhibit 6** at 4 (May 27, 2018 email RE: GE-RMI Generated Data – LVSW).
[13] *See* **Exhibit 6** at 1 (May 27, 2018 email RE: GE-RMI Generated Data – LVSW).

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

34.     Cedar continued to market Optiswitch to customers throughout 2018 and 2019. Each time Cedar began working with a new railroad, RMI provided FTP login credentials either directly to Cedar or through the customer so that Cedar could access a snapshot data feed for that customer.  RMI did so on each occasion without raising any concerns with Cedar.

35.     For example, between December 2018 and November 2018, RMI provided Cedar with unique login credentials to access snapshot data feeds for at least the following:  Grafton and Upton ("GU") and Port Harbor Railroad ("PHRR");[14] Gardendale Railroad ("GRD");[15] Cedar Rapids & Iowa City Railroad ("CIC");[16] Central Maine and Quebec Railway ("CMQ");[17] Port Terminal Railroad Association ("PTRA");[18] Texas North Western Railway ("TXNW");[19] and Portland Terminal Railroad Company ("PTRC").[20]

36.     Once activated, the snapshot data feeds were updated and downloaded by Cedar from the FTP server automatically, without requiring manual entry of login credentials each time.

37.     As Cedar continued to optimize the Optiswitch product and work with its customers, it became clear that the snapshot data feeds were insufficient for high-volume rail yards because the data became stale almost immediately because it was not a real-time data feed.  Customers wanted the TMS data to be sent to Optiswitch continuously, and wanted Optiswitch to be able to send data regarding inventory back to the TMS in real time.[21]  Cedar and its customers realized that an application programming interface ("API") between RailConnect and Optiswitch, which could exchange real-time data automatically, was necessary for Optiswitch to work as designed and as customers sought and needed.

---

[14] See **Exhibit 7** (Dec. 7, 2018 email FTP for Online Snapshot); see also **Exhibit 8** (Dec. 10, 2018 email Re: FTP for Online Snapshot); and **Exhibit 9** (Dec. 10, 2018 email  FTP for GU and PHRR).
[15] See **Exhibit 10** (Dec. 19, 2018 email RE: GRD Snapshot Feed).
[16] See **Exhibit 11** (Jan. 16, 2019 email RE: AEI FTP for CIC).
[17] See **Exhibit 12** (Jan. 16, 2019 email RE: CMQ); see also **Exhibit 13** (Jan. 29, 2019 email RE: Access).
[18] See **Exhibit 14** (Feb. 13, 2019 email RE: FTP for Snapshot for PTRA).
[19] See Evans Decl. Ex. C (Apr. 11, 2019 email RE: FTP).
[20] See **Exhibit 15** (Oct. 10, 2019 email RE: PTRC access).
[21] **Exhibit 1** (McCrory Declaration) ¶ 9.

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 32
Case No. 2:21-cv-00437-TSZ

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

38.     On information and belief, RMI customers are prohibited from or otherwise unable to provide their TMS data to Cedar directly.

**E.     RMI Abruptly Terminated Cedar's Access to the Snapshot Feeds**

39.     Although RMI authorized Cedar's access to the snapshot data feeds it used with its Optiswitch customers, Cedar was aware that RMI could unilaterally terminate the data feeds at any time.  RMI's sudden termination of Command demonstrated its willingness to abruptly terminate for its own benefit services customers need and rely on, which heightened concerns about the possibility of similar abrupt action affecting the data feeds needed for Optiswitch.

40.     The instability and uncertainty of this situation prevented Cedar from entering into Optiswitch contracts with potential customers that used the RailConnect TMS, which represented over 80% of Cedar's target customer base.

41.     On August 6-7, 2019, Brandon Parker, Andrew Parker, Jeremiah Dirnberger, and Nichole Peterson of RMI met with representatives from Cedar and mutual customer Portland Terminal Railroad Association ("PTRA") to discuss linking Optiswitch and RailConnect through an API.  David McCrory of PTRA explained what functionality he wanted to incorporate into Optiswitch and RailConnect and the parties discussed the feasibility of implementing his requested changes and replacing the snapshot data feeds with a continuous data exchange.[22] PTRA offered to pay for this improved data exchange.[23]

42.     Following the meeting, Cedar, PTRA, and RMI communicated about the API project for one to two months.  In late September 2019, RMI abruptly stopped responding to requests for updates.  After one additional follow-up with PTRA on December 6, RMI stopped communicating with Cedar and PTRA entirely and the project stalled.[24]

43.     Without an API, Optiswitch could not work as designed and the RailConnect customers who were using the product could not use it as intended.

---

[22] **Exhibit 1** (McCrory Declaration) ¶¶ 13-16.
[23] **Exhibit 1** (McCrory Declaration) ¶ 17.
[24] **Exhibit 1** (McCrory Declaration) ¶¶ 18-22.

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 33
Case No. 2:21-cv-00437-TSZ

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

**F.    Cedar Developed its Own TMS After Negotiations with RMI Failed**

44.    By early 2020, Cedar realized that without a reasonable guarantee of continued data sharing with RMI and an API that would enable real-time data feeds for customers' own TMS data, it could not move forward with Optiswitch unless it developed its own TMS.  As a result, Cedar began developing a new TMS platform, called Automated Rail Management System ("ARMS").

45.    In January 2020, Cedar won a competitive bid to build a modern TMS for Terminal Railroad of St. Louis ("TRRA").  TRRA was a RMI customer until 2015, when it switched to ShipXpress' Command product.  When RMI informed TRRA it was terminating Command, TRRA chose to explore alternative TMS vendors.[25]

46.    Cedar's software engineers possess decades of experience from Amazon, Google, Microsoft, Uber, and Docker.  Furthermore, many of Cedar's employees have deep experience in the rail industry, having worked at both railroads and other rail technology companies.  Cedar's combined expertise in software development and the rail industry—coupled with its existing brand and customer relationships within the Shortline Railroad TMS Market from its Optiswitch product—gave Cedar a novel perspective on data management and problem solving that allowed it to create its modern TMS, ARMS, in record time.

47.    ARMS is a full-featured inventory and revenue TMS platform for railroads that serves as a single source of truth for a railroad's inventory, and supports electronic data interchange across connecting railroads.  ARMS offers a simplified, user-friendly system. Railroad employees can become proficient in using ARMS in approximately 30 to 60 minutes,[26] whereas railroad employees took weeks to become proficient in using RMI's product, RailConnect.

48.    On information and belief, ARMS is also approximately 10-15% less expensive than RailConnect, making it an appealing and competitively-priced alternative to RailConnect.

---

[25] **Exhibit 2** (Mahlandt Declaration) ¶¶ 4-5, 7-8.
[26] **Exhibit 2** (Mahlandt Declaration) ¶ 16.

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 34
Case No. 2:21-cv-00437-TSZ

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

49.    Even before commercially launching ARMS, Cedar sold TMS services to five additional railroads, including three with RMI accounts:  Burlington Junction Railway, City of Rochelle Railroad, Farmrail Corporation, Grainbelt Corporation, and North Shore Railroad Company.  None had previously tried Optiswitch or had a snapshot data feed from RMI that Cedar could access.

50.    ARMS was a success.  Cedar migrated its first customers onto ARMS in June 2020.

**G.    RMI Abruptly Terminated Cedar's Access to the Snapshot Feeds**

51.    While RMI halted development of an API between Optiswitch and RailConnect in late 2019, from late 2019 until November 2020, RMI did not terminate Cedar's access to the snapshot feeds and never told Cedar it was no longer authorized to access the feeds.  The data feeds continued to update automatically, despite the fact that the RMI customers who had tried Optiswitch were no longer using the product and no one was utilizing the data feeds.

52.    On information and belief, on November 4, 2020, RMI unilaterally reset the FTP login credentials for the railroads that had been using Optiswitch, without prior notice.

**H.    RMI Used Coercive Means To Keep Dissatisfied Customers Locked-in to RailConnect**

53.    Cedar's development of ARMS in early 2020 coincided with RMI's sun-setting of the ShipXpress TMS, Command, and efforts to force Command customers onto the RMI TMS, RailConnect.  Upon learning about Cedar's new TMS, ARMS, several Command customers, including TRRA, wanted to switch to ARMS.[27]

54.    When RMI learned that some ShipXpress customers planned to let their contracts expire and then switch to ARMS, it sent notice of termination letters to those customers, notifying them that if they did not sign a new multi-year contract for RailConnect, their TMS services would be terminated in 60 days.  RMI sent such a notice of termination letter to TNW Corporation ("TNW") on January 13, 2021, stating that TNW's TMS services would be

---

[27] **Exhibit 2** (Mahlandt Declaration) ¶¶ 8, 11.

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 35
Case No. 2:21-cv-00437-TSZ

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1   terminated in 60 days unless it executed an amendment to extend its contract's original four-

2   year term.[28]  On information and belief, RMI sent similar letters to other Command customers.

3        55.    It typically takes about six months to build out a TMS for each new customer and

4   for the customer to transition to the new system.  Because it was impossible for Command

5   customers to switch to ARMS within 60 days (as RMI knew) and they could not suffer a

6   shutdown of their TMS, these railroads had no choice but to contract with RMI or cease

7   operations.

8        56.    In early- to mid-2021, RMI sent similar notice of termination letters to

9   RailConnect customers whose contracts were about to become "evergreen," meaning that

10  when the initial contract term expired, it would become month-to-month.  Like with the

11  Command customers, these letters threatened to cut off the RMI customers' TMS services if

12  they did not sign a new multi-year contract for RailConnect.  RMI sent PTRA such a letter in or

13  around March 2021, threatening to terminate PTRA's access to RailConnect unless PTRA

14  executed a new three-year contract.[29]

15       57.    RMI knows that railroads must have a TMS in order to conduct business and that

16  it typically takes more than 60 days for a railroad to switch TMS products.[30]  It leveraged that

17  knowledge by threatening to discontinue service unless customers committed to a new multi-

18  year contract for RailConnect.  It purposefully timed its notice of termination letters to reach

19  customers before Cedar had time to move additional customers onto ARMS, thereby seeking to

20  lock-in customers to RailConnect and put Cedar out of business.

21       58.    It is not feasible for shortline railroads to use more than one TMS product at one

22  time.  On information and belief, most shortline railroads could not afford the cost of running

23  two TMS products simultaneously and would not choose to operate duplicative operating

24  systems, as it would create a risk of inconsistencies and incur substantial cost and inefficiencies.

25

26  [28] *See* **Exhibit 3** (Evans Declaration) ¶ 14, Evans Decl. Ex. A (Jan. 13, 2021 Non-renewal letter from Wabtec to
    TNW).

27  [29] **Exhibit 1** (McCrory Declaration) ¶¶ 29-31.
    [30] **Exhibit 3** (Evans Declaration) ¶ 15; **Exhibit 1** (McCrory Declaration) ¶ 30.
    DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
    ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
    COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 36
    Case No. 2:21-cv-00437-TSZ

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    Thus, by forcing shortline railroads into signing multi-year contracts, RMI is foreclosing those

2    customers from its competitors, including Cedar.  In other words, RMI's contracts with its

3    RailConnect customers are, at least, de facto exclusive agreements that effectively foreclose

4    competition from competing TMS providers for at least the term of those agreements.

5        59.    On information and belief, RMI also deters railroads from seeking an alternative

6    TMS service provider by charging onerous early termination fees for cancelling a contract with

7    RMI.  Exorbitant early termination fees deter railroads that otherwise might seek TMS services

8    from another vendor.

9        60.    RMI has also sought to deter railroads from switching TMS service providers by

10   restricting customers' access to their historical data after leaving RMI.[31]  Railroads must have

11   access to historical data in order to conduct their business.  For example, railroads rely on

12   historical data to create reports regarding business trends, growth, and revenue; and railroads

13   often search historical data at the request of shippers who, for example, need to know the

14   location or status of a particular railcar on a certain date.  Railroads cannot risk a lack of access

15   to their historical data.[32]

16       61.    When TNW notified RMI that it would not renew its RailConnect contract, TNW

17   requested a copy of its historical data or, alternatively, offered to pay RMI to keep TNW's old

18   data online.  RMI refused, making TNW 's transition from RailConnect to ARMS particularly

19   painful.[33]  Similarly, when TRRA decided to switch to ARMS, RMI made its transition

20   unnecessarily difficult by sending TRRA's historical data to Cedar in a disorganized format.[34]  On

21   information and belief, RMI has deterred other railroads considering switching TMS providers

22   from leaving RMI by threatening to withhold their historical data or charge an exorbitant price

23   for access to it.

24

25

---

26   [31] *See* **Exhibit 3** (Evans Declaration) ¶¶ 19-20.
     [32] **Exhibit 3** (Evans Declaration) ¶¶ 21-24.
27   [33] **Exhibit 3** (Evans Declaration) ¶¶ 19-20, 22-24.
     [34] **Exhibit 2** (Mahlandt Declaration) ¶ 15.

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 37
Case No. 2:21-cv-00437-TSZ

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

62.     Shortline railroad customers have told Cedar that they want to switch to ARMS, but cannot because of RMI's conduct.

**I.     Wabtec Attempted to Acquire Cedar**

63.     Since late 2019, Wabtec has made several overtures to acquire Cedar.

64.     During discussions with Wabtec in 2019 that were purportedly related to integrating Optiswitch and RailConnect, it became clear that Wabtec was not willing to enter into a data-sharing arrangement with Cedar, but was instead focused on acquiring Cedar.

65.     After Cedar won the bid with TRRA in January 2020 and began developing ARMS, Wabtec reached out (after falling silent in late 2019) to propose further discussions between the parties.  On May 13, 2020, Brandon Parker, Senior Director of Product Management at Wabtec, emailed Steve Murray of Cedar on behalf of Wabtec Vice President Scott Holland to schedule "an informative discussion with yourself and the Cedar AI team … to gain [an] informative understanding of Cedar AI's product offering/strategy, to allow a better understanding of potential alignments."[35]

66.     Wabtec requested that the parties sign a mutual non-disclosure agreement in advance of the meeting, which Cedar agreed to.[36]

67.     On May 21, 2020, the Cedar team met with Mr. Holland who told Cedar to "stay in [its] lane" and focus on rail yard optimization (i.e., Optiswitch), rather than railcar management (i.e., ARMS).  Daril Vilhena, Cedar's co-CEO, pointed out that Cedar had no choice but to create its own TMS because RMI refused to sell access to the inventory data that Optiswitch relies on.  Wabtec again expressed interest in acquiring Cedar, but Cedar indicated it was not interested and the meeting ended with no planned follow-up.

68.     On October 16, 2020, Mr. Holland contacted Mario Ponticello, Cedar's co-CEO and CFO, to "hear how things are going and chat a bit about what we are doing on this end."[37]

---

[35] *See* **Exhibit 16** (May 13, 2020 email from Brandon Parker RE: Wabtec/Cedar AI Meeting).
[36] *See* **Exhibit 16** (May 15, 2020 email from Steve Murray to Brandon Parker RE: Wabtec/Cedar AI Meeting).
[37] *See* **Exhibit 17** (Oct. 16, 2020 email from Scott Holland to Mario Ponticello RE: Time to Catch Up).

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 38
Case No. 2:21-cv-00437-TSZ

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  Mr. Ponticello had a phone call with Mr. Holland shortly thereafter, in which Mr. Holland again

2  raised the possibility of acquisition and Mr. Ponticello again declined.

3     69.    These discussions all preceded RMI's November 4, 2020 cut-off of Cedar's access

4  to the snapshot data feeds.

5     70.    On March 5, 2021, nearly five months after RMI unilaterally cut off the data

6  feeds, Mr. Holland contacted Mr. Ponticello once again to propose purchasing Cedar, and Cedar

7  once again declined.[38]

8     71.    Cedar has refused all of Wabtec's offers for various reasons, including concern

9  that RMI would terminate ARMS as it did with ShipXpress's TMS product, Command, after

10 acquiring it.  Cedar has developed an innovative, cost-effective TMS product for shortline

11 railroads that already has growing demand and that is positioned to pose substantial

12 competition to RMI in the Shortline Railroad TMS Market, which RMI continues to dominate.

13 Cedar is unwilling to allow RMI to again shut down competition as it did with Command.

14 **J.    RMI's Lawsuit Against Cedar is Part of its Scheme to Stifle Competition**

15    72.    RMI commenced this lawsuit against Cedar on April 1, 2021, alleging that Cedar

16 improperly accessed and used RMI's confidential data in an attempt to gain an unfair

17 competitive advantage.  RMI initiated the lawsuit less than a month after Cedar declined

18 Wabtec's most recent acquisition offer.  On information and belief, RMI filed the lawsuit

19 because Cedar refused Wabtec's repeated acquisition overtures.  The lawsuit is part of a

20 scheme by RMI to foreclose competition from Cedar and a means to intimidate, harass, and

21 coerce Cedar into selling itself to Wabtec or to drive Cedar out of business with burdensome

22 legal fees, thereby eliminating RMI's only real competitor in the Shortline Railroad TMS Market.

23    73.    On information and belief, RMI realized that Cedar was a viable competitor in

24 the Shortline Railroad TMS Market after Cedar launched ARMS in June 2020.  Until that point,

25 without its own TMS, Cedar was at the mercy of RMI and, thus, subject to its control under the

26 threat of RMI terminating the snapshot data feeds.

27 _____

[38] *See* **Exhibit 18** (Mar. 5, 2021 email from Scott Holland to Mario Ponticello RE: Quick Call?).

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 39
Case No. 2:21-cv-00437-TSZ

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

74.     On information and belief, after RMI learned of Cedar's successful implementation of ARMS, it decided to cry foul over Cedar's supposed reliance on the snapshot data feeds.  However, the snapshot data feeds were unnecessary for the development of ARMS.

75.     RMI authorized Cedar to access the snapshot data feeds, but filed this lawsuit anyway.

76.     RMI asserted numerous allegations that are contradicted by facts known to RMI and Wabtec, such as: (1) Optiswitch is not a TMS; (2) GE, Wabtec, and RMI employees granted Cedar access to multiple railroads' TMS snapshot data via an external FTP server; (3) the snapshot data feeds were active from various dates in 2018 and 2019 until November 2020, when RMI claims it "discovered" the feeds and shut them down; (4) Cedar was not accessing these railroads' actual TMS systems in RailConnect because the snapshot data was uploaded to a completely separate external FTP server; (5) it would be impossible to reverse-engineer a database program as complex as a TMS from the inventory data contained in a snapshot file; and (6) the snapshot files Cedar had access to did not contain "car hire data."

77.     On April 1, 2021, RMI filed its motion for expedited discovery (Dkt. 2) and the original complaint (Dkt. 1).  RMI told the Court that it had allegedly noticed "unusual activity on [TMS]...namely more frequent logins and an abnormal spike in the frequency and volume of data being downloaded."  (Dkt. 2 at 1:25-2:1.)  RMI also represented to the Court that the only way it could identify the Doe defendants was to issue a subpoena to Amazon Web Services.  *Id.* at 2:18-20.  In fact, RMI knew that the snapshot data feeds had been set up for Cedar's Optiswitch users and that the feeds automatically updated at frequent intervals to keep the inventory data as accurate as possible, which would account for a large volume of simultaneous downloads occurring on 15 different railroad logins.

78.     RMI filed the complaint against nascent competitor Cedar even though RMI knew that many of the factual allegations against Cedar were untrue.

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 40
Case No. 2:21-cv-00437-TSZ

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    79.    RMI's lawsuit against Cedar is objectively baseless and intended to interfere with

2    Cedar's business.

3    **K.    The Relevant Antitrust Market and RMI's Market Power**

4    80.    There is a relevant antitrust market for TMS products for shortline railroads

5    ("Shortline Railroad TMS Market").  TMS products for shortline railroads provide unique,

6    specialized functionality and tools required by shortline railroads with distinct and complex

7    needs including, but not limited to, handling railcars at the last-mile portion of a rail network,

8    interchanging data with Class I railroads, car ordering, car history, waybilling support,

9    load/release/rebill processing, track control, complete inventory management, customer

10   management, complex revenue management, and business intelligence.  Because of these

11   specific features, there is no other product that is a reasonably interchangeable substitute for

12   TMS products for shortline railroads.

13   81.    The Shortline Railroad TMS Market is distinct from the TMS market for Class I

14   railroads, such as BNSF Railway Company and Norfolk Southern.  Class I railroads design and

15   maintain their own bespoke TMS products, while shortline railroads typically use outside

16   vendors to supply a TMS.  In addition, there are a small number of shortline railroads that are

17   provided free access to a Class I TMS product and, thus, are not included in the relevant

18   Shortline Railroad TMS Market.

19   82.    Shortline railroads are also distinct from third-party switchers.  Third-party

20   switchers move railcars within a rail yard, but are not intended for moving trains over a longer

21   distance, and are not legally considered Class II or Class III railroads by the STB.  Accordingly,

22   third-party switchers have much less complex needs than shortline railroads, which have to be

23   able to interconnect with numerous Class I and other shortline railroads.  This requires a much

24   broader set of EDI data and complex industry messaging with Railinc, a subsidiary of the

25   Association of American Railroads ("AAR").  Thus, a TMS designed for use by a third-party

26   switcher would be insufficient to meet the needs of a shortline railroad, and companies that

27

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 41
Case No. 2:21-cv-00437-TSZ

1  provide TMS products designed for use by third-party switchers do not compete in the for

2  Shortline Railroad TMS Market.

3      83.    The relevant geographic market is the United States.  Domestic shortline

4  railroads source TMS products exclusively within the United States.  There are no international

5  companies that offer TMS products designed for shortline railroads operating within the United

6  States.  Shortline railroads can and do source TMS products from suppliers located anywhere

7  within in the United States because TMS products are software solutions that can be created,

8  customized, and used remotely from any location within the United States.

9      84.    The Shortline Railroad TMS Market is highly concentrated and comprised of a

10  small number of market participants.  RMI has long held and continues to hold a dominant and

11  controlling position in the Shortline Railroad TMS Market.  On information and belief, RMI has

12  controlled over 80% share of the Shortline Railroad TMS Market for at least 10 years.

13      85.    Today, Cedar is RMI's only major competitor in this market with an estimated

14  market share of approximately 4%.  RMI acquired its only other major competitor in the

15  Shortline Railroad TMS Market, ShipXpress, and terminated its TMS product, Command, in

16  2020.  There are a small number of fringe suppliers in the Shortline Railroad TMS Market, but

17  these providers are not considered viable competitors by shortline railroads.

18      86.    Since RailConnect's launch in the early 1990s, RMI's market position has been

19  protected by high barriers to entry and expansion.  Developing a full-fledged TMS is an

20  enormous undertaking because it is the core processing center for a railroad's entire business

21  operations.  Thus, it requires specialized expertise and an investment of capital and time to

22  create and maintain a TMS product that can only be marketed to a limited audience.  Cedar has

23  spent millions of dollars on developing ARMS.

24      87.    Joey Evans of TNW explored the possibility of creating a TMS for TNW's shortline

25  railroad, TXNW, in 2019 and determined that it was not feasible because it would take too long

26  and cost millions of dollars.[39]

27  _____

[39] **Exhibit 3** (Evans Declaration) ¶ 11.

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 42
Case No. 2:21-cv-00437-TSZ

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

88.     Cedar represents a competitive threat to RMI because it was able to overcome these substantial barriers to entry by leveraging its employees' unique combination of software engineering experience and shortline railroad expertise—as well as its brand and relationships with shortline railroads with respect to Optiswitch—to create a new TMS product in record time.  Cedar is the only supplier to break into the Shortline Railroad TMS Market in the last decade.

89.      RMI's dominant market share has given it the ability to exercise price control and charge supracompetitive prices for RailConnect for years.  On information and belief, Command cost approximately half as much as RailConnect prior to ShipXpress's acquisition. Cedar's TMS, ARMS, costs approximately 10-15% less than RailConnect.  Despite its antiquated technology, poor customer service, and refusal to respond to customers' requests for product improvements, RMI continues to charge a premium price for RailConnect.

90.     Switching TMS products is an enormous and costly undertaking for a shortline railroad.  The railroad has to ensure that historical data is transferred into the new system and replicate all reporting and operational processes, which are typically customized by customer. It also has to train employees on the new system.[40]  It is also a costly undertaking, not just because the railroad is licensing a new product.

91.     In addition to these costs, the process of switching TMS products creates burdens and significant risks to a shortline railroad, including potentially severe and costly disruptions to its operations.  While a TMS is offline, the railroad cannot function.  When a railroad is unable to function, inventory gets backed up, transportation delays snowball, and rail shippers incur fees for demurrage.

92.     The transition to a new TMS typically takes at least six months because a TMS must be customized for each railroad.

---

[40] **Exhibit 3** (Evans Declaration) ¶ 15.

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 43
Case No. 2:21-cv-00437-TSZ

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

93. Thus, the difficulty, costs, and risk of switching TMS products deters railroads from seeking out alternatives to the system with which they are familiar, even if the alternative is more efficient, innovative, and cost effective.

94. RMI has monopoly power over the vast majority of shortline railroads that are locked-in to RailConnect due in part to the significant costs and burdens of changing from one TMS product to another and the risk that RMI will terminate RailConnect before the railroad can transition to a new TMS, should RMI suspect they are seeking to do so.

95. If RMI is allowed to persist in its pattern of anticompetitive acts and successfully extinguishes the competitive threat from Cedar, it will send a strong signal to other potential future market entrants that competition is futile, thereby further cementing its market dominance and perpetuating the harm to competition and ultimately customers.

**L.    RMI's Anticompetitive Conduct Causes Harm to Competition and Consumers**

96. As detailed above, RMI, GE, and Wabtec have engaged in a pattern of anticompetitive conduct and substantially harmed competition in the Shortline Railroad TMS Market.

97. RMI, acting through its parent GE, acquired its only existing competitor, ShipXpress, in 2016 and, on information and belief, then raised the price for its TMS product, Command.  Following Wabtec's acquisition of GE in February 2019, Wabtec terminated Command altogether, thereby eliminating the only competitive shortline TMS product on the market at the time.

98. Wabtec has similarly sought to eliminate Cedar as a nascent competitor through acquisition, making several overtures to Cedar since 2019.

99. Unable to eliminate Cedar through acquisition, as it had done with ShipXpress, RMI initiated a campaign to lock customers into new, multi-year contracts, knowing that those customers would then be foreclosed from switching to Cedar's new TMS product, ARMS.  RMI sent notice of termination letters to customers, threatening to terminate their TMS service unless the customers signed new contracts for RailConnect.  RMI's efforts had its intended

1  effect, forcing unwilling customers, including PTRA, to sign new RailConnect contracts rather

2  than switch to the product that they wanted and that better meets their needs at a lower cost:

3  ARMS.[41]

4       100.    RMI purposefully timed its notice of termination letters to reach customers

5  before Cedar had time to migrate more than a handful of customers onto ARMS, thereby

6  seeking to lock-in customers to RailConnect; sabotage its only viable competitor, ARMS; and

7  put Cedar out of business.

8       101.    RMI has also sought to deter railroads from switching TMS service providers by

9  restricting customers' access to historical data after leaving RailConnect and making their

10  transition to a new TMS product unnecessarily painful.  On information and belief, this conduct

11  is having a chilling effect on shortline railroads contemplating leaving RailConnect for ARMS,

12  and RMI controls over 80% of the Shortline Railroad TMS Market.

13       102.    RMI's conduct has allowed it to exercise price control, exclude competition, and

14  eliminate or substantially reduce customer choice, and will have the effect of inhibiting

15  technical innovation, increasing costs, reducing quality, and reducing output in the Shortline

16  Railroad TMS Market.

17       103.    RMI has substantially harmed competition in the Shortline Railroad TMS Market,

18  and that reduction in competition has harmed actual and potential competing suppliers,

19  including Cedar, as well as railroad customers.

20       104.    There are no procompetitive benefits for RMI's conduct, which serves only to

21  force customers to use a TMS product that is antiquated, inadequate, and supracompetitively-

22  priced.

23

24

25

26

27

---

[41] **Exhibit 1** (McCrory Declaration) ¶¶ 30-31.

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 45
Case No. 2:21-cv-00437-TSZ

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

## V.    COUNTERCLAIMS AND THIRD-PARTY CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### (Monopolization in Violation of Section 2 of the Sherman Act (15 U.S.C. § 2))

105.    Cedar repeats and incorporates by reference all preceding paragraphs and allegations.

106.    RMI provides a Shortline Railroad TMS product that is used by Class II and Class III railroads in the United States, RailConnect.   Upon information and belief, RMI's Shortline Railroad TMS product, RailConnect, has an over 80% share of the Shortline Railroad TMS Market.  Further, on information and belief, RMI has profitably charged prices above the competitive level in the Shortline Railroad TMS Market for a sustained amount of time.  As a consequence, RMI possesses monopoly power in the Shortline Railroad TMS Market.

107.    Along with a dominant share of the market, RMI also wields monopoly power because of the high costs and risk of business disruption a shortline railroad must incur in order to switch to an alternative TMS provider.  As a result of its hold on the Shortline Railroad TMS Market, RMI has the ability to control prices, exclude competition, and reduce customer choice.

108.    Cedar offers a unique competitive threat to RMI's dominance in the Shortline Railroad TMS Market, and RMI has acted aggressively and anticompetitively to extinguish that threat and preserve its monopoly power.  Cedar offers a competitive Shortline Railroad TMS product, ARMS.  However, a high quality, competitive Shortline Railroad TMS product may not be enough to cause a shortline railroad to move away from RMI because of the costs, complexities, and risks associated with switching products.  Cedar's unique position stems from its simplified user-friendly technology, reduced costs, and strong reputation among shortline railroad customers.  As a result, Cedar offers customers a more seamless and risk-free alternative to transition away from RMI.  RMI thus has engaged in ongoing efforts to undermine Cedar, impair its products, interfere with prospective customers, and impede its ability to compete fairly for shortline railroad customers.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

109.    RMI has similarly interfered with the ability of other providers to compete effectively on the merits of their products.  For example, in 2016, RMI acquired ShipXpress, a competitor that also offered TMS services to shortline railroads, and after Wabtec acquired RMI in 2019, it discontinued ShipXpress's competing TMS product, Command.

110.    Likewise, Wabtec has attempted to acquire Cedar, making multiple overtures since 2019.  Like it did with ShipXpress, Wabtec is attempting to eliminate the competitive threat to RailConnect from ARMS through acquisition.

111.    Not confident that it can either compete with Cedar on the merits or eliminate it through acquisition, RMI has taken additional steps to eliminate ARMS before it gains a foothold in the market.  When RMI learned that former ShipXpress customers intended to switch to Cedar's ARMS product, RMI threatened to terminate these customers' TMS services if they did not sign a new multi-year contract for RailConnect.  Upon information and belief, RMI has also coerced customers into signing long-term contracts with substantial early termination fees, thereby preventing customers from switching to alternative suppliers.  In addition, RMI has restricted customers' access to historical data and made their transition to a new TMS product unnecessarily painful, seeking to deter those and other customers from switching TMS providers.

112.    RMI's baseless lawsuit against Cedar is yet another anticompetitive tactic designed to exclude competition in the relevant market.

113.    RMI has willfully maintained its monopoly power through exclusionary conduct designed to foreclose competition, to gain a competitive advantage, and to destroy competitors in the Shortline Railroad TMS Market.  RMI's actions have had and continue to have the effect of injuring the competitive process in the entire relevant market and depriving shortline railroad customers of free choice.  By creating barriers to customers seeking alternatives to its outdated and inefficient TMS, RMI has used its monopoly level of power to force many railroads that would prefer a more innovative TMS product to instead continue to use RMI's services.  Further, RMI's anticompetitive conduct has foreclosed competitors, including but not

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 47 Case No. 2:21-cv-00437-TSZ

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  limited to Cedar, from competing in a substantial share of the market.  Overall, RMI's pattern of

2  anticompetitive conduct has reduced (and continues to reduce) customer choice in the

3  Shortline Railroad TMS Market, and will have the effect of inhibiting technical innovation,

4  increasing costs, reducing quality, and reducing output.  Furthermore, RMI's conduct does not

5  improve its product, efficiency, or ability to compete on the merits of its Shortline Railroad TMS

6  product.  To the contrary, RMI is exercising monopoly power to prevent Cedar from competing

7  on the merits and foreclosing the benefits that free competition would bring to the market.

8  RMI's unlawful conduct has caused and will continue to directly and proximately cause injury or

9  loss to interstate commerce and shortline railroad customers.

10      114.    The conduct set forth above constitutes unreasonable and anticompetitive

11  means by which RMI is willfully maintaining dominant monopoly power in the Shortline

12  Railroad TMS Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

13      115.    As a result of RMI's unlawful acts and the damage it has caused to free and fair

14  competition in the Shortline Railroad TMS Market, Cedar has suffered and will continue to

15  suffer direct and tangible injury.  Cedar is entitled to injunctive and monetary relief, including

16  treble damages and attorneys' fees, pursuant to 15 U.S.C. §§ 15 and 16.  Cedar's damages are

17  not speculative and will be proven at trial.

18                    **<u>SECOND CLAIM FOR RELIEF</u>**

19    **(Attempted Monopolization in Violation of Section 2 of the Sherman Act (15 U.S.C. § 2))**

20      116.    Cedar repeats and incorporates by reference all preceding paragraphs and

21  allegations.

22      117.    To the extent that RMI does not already have monopoly power, in the

23  alternative, there is a dangerous probability that RMI will achieve monopoly power in the

24  relevant Shortline Railroad TMS Market.  RMI's anticompetitive conduct threatens to

25  substantially eliminate competition in Shortline Railroad TMS Market and further establish

26  RailConnect as the dominant TMS product.

27

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 48
Case No. 2:21-cv-00437-TSZ

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

118.    RMI has engaged in anticompetitive conduct with the specific intent to obtain monopoly power through exclusionary and anticompetitive means.  In 2016, RMI acquired its only major competitor, ShipXpress, and subsequently terminated ShipXpress's competing TMS product, Command.  When Cedar launched a competing TMS product in 2020, RMI initiated an aggressive campaign to lock-up shortline railroad customers in new multi-year contracts, thereby foreclosing them from switching to Cedar's new product.  RMI purposefully timed its actions to sabotage Cedar's launch of its competing product and put Cedar out of business.

119.    Wabtec has repeatedly attempted to acquire Cedar, including after it launched ARMS, hoping to stifle a competitive threat to RMI's dominance in the Shortline Railroad TMS Market.

120.    RMI's baseless lawsuit against Cedar is yet another anticompetitive tactic designed to exclude competition in the relevant market.

121.    RMI's actions have had and continue to have the effect of injuring the competitive process in the entire relevant market and depriving customers of free choice.  By creating barriers to customers seeking alternatives to its outdated and inefficient TMS, RMI seeks to force many railroads that would prefer a more innovative TMS product to instead continue to use RMI's services.  Further, RMI's anticompetitive conduct has foreclosed competitors, including Cedar, from competing in a substantial share of the market, thereby creating a dangerous probability that RMI will achieve monopoly power in the relevant Shortline Railroad TMS Market.

122.    Overall, RMI's pattern of anticompetitive conduct has reduced (and continues to reduce) customer choice in the Shortline Railroad TMS Market, and will have the effect of cementing RMI's dominance in the market, inhibiting technical innovation, increasing costs, reducing quality, and reducing output.

123.    RMI's unlawful conduct has caused and will continue to directly and proximately cause injury or loss to interstate commerce, competitors, and shortline railroad customers.

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

124.    The conduct set forth above constitutes unreasonable and anticompetitive means by which RMI has attempted to monopolize the Shortline Railroad TMS Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

125.    As a result of RMI's unlawful acts and the damage it has caused to free and fair competition in the Shortline Railroad TMS Market, Cedar has suffered and will continue to suffer direct and tangible injury.  Cedar is entitled to injunctive and monetary relief, including treble damages and attorneys' fees, pursuant to 15 U.S.C. §§ 15 and 16.  Cedar's damages are not speculative and will be proven at trial.

### THIRD CLAIM FOR RELIEF

### (Monopolization in Violation of WASH. REV. CODE § 19.86.040)

126.    Cedar repeats and incorporates by reference all preceding paragraphs and allegations.

127.    RMI provides a Shortline Railroad TMS product that is used by Class II and Class III railroads in the United States, RailConnect.  Upon information and belief, RMI's Shortline Railroad TMS product, RailConnect, has an over 80% share of the Shortline Railroad TMS Market.  Further, on information and belief, RMI has profitably charged prices above the competitive level in the Shortline Railroad TMS Market for a sustained amount of time.  As a consequence, RMI possesses monopoly power in the Shortline Railroad TMS Market.

128.    Along with a dominant share of the market, RMI also wields monopoly power because of the high costs and risk of business disruption a shortline railroad must incur in order to switch to an alternative TMS provider.  As a result of its hold on the Shortline Railroad TMS Market, RMI has the ability to control prices, exclude competition, and reduce customer choice.

129.    Cedar offers a unique competitive threat to RMI's dominance in the Shortline Railroad TMS Market, and RMI has acted aggressively and anticompetitively to extinguish that threat and preserve its monopoly power.  Cedar offers a competitive Shortline Railroad TMS product, ARMS.  However, a high quality, competitive Shortline Railroad TMS may not be enough to cause a shortline railroad to move away from RMI because of the costs,

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  complexities, and risks associated with switching products.  Cedar's unique position stems from

2  its simplified user-friendly technology, reduced costs, and strong reputation among shortline

3  railroad customers.  As a result, Cedar offers customers a more seamless and risk-free

4  alternative to transition away from RMI.  RMI thus has engaged in ongoing efforts to undermine

5  Cedar, impair its products, interfere with prospective customers, and impede its ability to

6  compete fairly for shortline railroad customers.

7       130.    RMI has similarly interfered with the ability of other providers to compete

8  effectively on the merits of their products.  For example, in 2016, RMI acquired ShipXpress, a

9  competitor that also offered TMS services to shortline railroads, and after Wabtec acquired RMI

10  in 2019, Wabtec discontinued ShipXpress's competing TMS product, Command.

11       131.    Likewise, Wabtec has made repeated overtures to attempt to acquire Cedar.

12  Like it did with ShipXpress, Wabtec is attempting to eliminate the competitive threat to

13  RailConnect from ARMS through acquisition.

14       132.    Not confident that it can either compete with Cedar on the merits or eliminate it

15  through acquisition, RMI has taken additional steps to eliminate ARMS before it gains a

16  foothold in the market.  When RMI learned that former ShipXpress customers intended to

17  switch to Cedar's ARMS product, RMI threatened to terminate these customers' TMS services if

18  they did not sign a new multi-year contract for RailConnect.  Upon information and belief, RMI

19  has also coerced customers into signing long-term contracts with substantial early termination

20  fees, thereby preventing customers from switching to alternative suppliers.  RMI's lawsuit

21  against Cedar is yet another anticompetitive tactic designed to exclude competition in the

22  relevant market.  In addition, RMI has restricted customers' access to historical data and made

23  their transition to a new TMS product unnecessarily painful, seeking to deter those and other

24  customers from switching TMS providers.

25       133.    RMI has willfully maintained its monopoly power through exclusionary conduct

26  designed to foreclose competition, to gain a competitive advantage, and to destroy competitors

27  in the United States market.  RMI's actions have had and continue to have the effect of injuring

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 51
Case No. 2:21-cv-00437-TSZ

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  the competitive process in the entire relevant market and depriving shortline railroad

2  customers of free choice.  By creating barriers to customers seeking alternatives to its outdated

3  and inefficient TMS, RMI has used its monopoly level of power to force many railroads that

4  would prefer a more innovative TMS product to instead continue to use RMI's services.

5  Further, RMI's anticompetitive conduct has foreclosed competitors, including Cedar, from

6  competing in a substantial share of the market.  Overall, RMI's pattern of anticompetitive

7  conduct has reduced (and continues to reduce) customer choice in the Shortline Railroad TMS

8  Market, and will have the effect of inhibiting technical innovation, increasing costs, reducing

9  quality, and reducing output.  Furthermore, RMI's conduct does not improve its product,

10  efficiency, or ability to compete on the merits of its Shortline Railroad TMS product.  To the

11  contrary, RMI is exercising monopoly power to prevent Cedar from competing on the merits

12  and foreclosing the benefits that free competition would bring to the market.  RMI's unlawful

13  conduct has caused and will continue to directly and proximately cause injury or loss to

14  interstate commerce and shortline railroad customers.

15      134.    The conduct set forth above constitutes unreasonable and anticompetitive

16  means by which RMI is willfully maintaining dominant monopoly power in the Shortline

17  Railroad TMS Market, in violation of Washington's Consumer Protection Act (CPA), WASH. REV.

18  CODE § 19.86.040.

19      135.    As a result of RMI's unlawful acts and the damage it has caused to free and fair

20  competition in the Shortline Railroad TMS Market, Cedar has suffered and will continue to

21  suffer direct and tangible injury.  Cedar is entitled to injunctive and monetary relief, including

22  treble damages and attorneys' fees, and civil penalties pursuant to WASH. REV. CODE

23  §§ 19.86.090 and 19.86.140.  Cedar's damages are not speculative and will be proven at trial.

24                      **FOURTH CLAIM FOR RELIEF**

25          **(Attempted Monopolization in Violation of WASH. REV. CODE § 19.86.040)**

26      136.    Cedar repeats and incorporates by reference all preceding paragraphs and

27  allegations.

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 52
Case No. 2:21-cv-00437-TSZ

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  137.    To the extent that RMI does not already have monopoly power, in the

2  alternative, there is a dangerous probability that RMI will achieve monopoly power in the

3  relevant Shortline Railroad TMS Market.  RMI's anticompetitive conduct threatens to

4  substantially eliminate competition in Shortline Railroad TMS Market and further establish

5  RailConnect as the dominant TMS product.

6  138.    RMI has engaged in anticompetitive conduct with the specific intent to obtain

7  monopoly power through exclusionary and anticompetitive means.  In 2016, RMI acquired its

8  only major competitor, ShipXpress, and subsequently terminated ShipXpress's competing TMS

9  product, Command.   When Cedar launched a competing TMS product in 2020, RMI initiated an

10  aggressive campaign to lock-up shortline railroad customers in new multi-year contracts,

11  thereby foreclosing them from switching to Cedar's new product.  RMI purposefully timed its

12  actions to sabotage Cedar's launch of its competing product and put Cedar out of business.

13  139.    Wabtec has repeatedly attempted to acquire Cedar, including after it launched

14  ARMS, hoping to stifle a competitive threat to RMI's dominance in the Shortline Railroad TMS

15  Market.

16  140.    RMI's baseless lawsuit against Cedar is yet another anticompetitive tactic

17  designed to exclude competition in the relevant market.

18  141.    RMI's actions have had and continue to have the effect of injuring the

19  competitive process in the entire relevant market and depriving customers of free choice.  By

20  creating barriers to customers seeking alternatives to its outdated and inefficient TMS, RMI

21  seeks to force many railroads that would prefer a more innovative TMS product to instead

22  continue to use RMI's services.  Further, RMI's anticompetitive conduct has foreclosed

23  competitors, including Cedar, from competing in a substantial share of the market, thereby

24  creating a dangerous probability that RMI will achieve monopoly power in the relevant

25  Shortline Railroad TMS Market.

26  142.    Overall, RMI's pattern of anticompetitive conduct has reduced (and continues to

27  reduce) customer choice in the Shortline Railroad TMS Market, and will have the effect of

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 53
Case No. 2:21-cv-00437-TSZ

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    cementing RMI's dominance in the market, inhibiting technical innovation, increasing costs,

2    reducing quality, and reducing output.

3        143.    RMI's unlawful conduct has caused and will continue to directly and proximately

4    cause injury or loss to interstate commerce, competitors and shortline railroad customers.

5        144.    The conduct set forth above constitutes unreasonable and anticompetitive

6    means by which RMI has attempted to monopolize the Shortline Railroad TMS Market, in

7    violation of Washington's Consumer Protection Act (CPA), WASH. REV. CODE § 19.86.040.

8        145.    As a result of RMI's unlawful acts and the damage it has caused to free and fair

9    competition in the Shortline Railroad TMS Market, Cedar has suffered and will continue to

10   suffer direct and affirmative tangible injury.  Cedar is entitled to injunctive and monetary relief, including

11   treble damages and attorneys' fees, and civil penalties pursuant to WASH. REV. CODE

12   §§ 19.86.090 and 19.86.140.  Cedar's damages are not speculative and will be proven at trial.

13                          **FIFTH CLAIM FOR RELIEF**

14       **(Refusal to Deal in Violation of Section 2 of the Sherman Act (15 U.S.C. § 2))**

15       146.    Cedar repeats and incorporates by reference all preceding paragraphs and

16   allegations.

17       147.    RMI is the dominant player in the Shortline Railroad TMS Market, with over 80%

18   market share.  Along with a dominant share of the market, RMI also wields monopoly power

19   because of the high costs and risk of business disruption a shortline railroad must incur in order

20   to switch to an alternative TMS provider.  As a result of its hold on the Shortline Railroad TMS

21   Market, RMI has the ability to control prices and exclude competition.  Accordingly, RMI

22   possesses monopoly power in the Shortline Railroad TMS Market.

23       148.    RMI engaged in a voluntary course of dealing with Cedar from 2018 to 2020.  In

24   2018, Cedar told RMI about Optiswitch and how it could complement RailConnect and benefit

25   RMI's RailConnect customers by analyzing the inventory data that railroads stored in their

26   TMSs.  RMI expressed interest in a strategic business alignment, and from May 2018 to

27   November 2020, RMI provided TMS inventory data via snapshot feeds to Cedar for 15 railroads

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 54
Case No. 2:21-cv-00437-TSZ

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    to enable them to use Optiswitch.  However, RMI rejected Cedar's and customers' repeated

2    attempts to reach a commercial agreement to pay for real-time access to the data exported

3    from RailConnect, conditioning such an arrangement on Wabtec acquiring Cedar.  In November

4    2020, RMI suddenly and without warning reset all the FTP login credentials for those railroads

5    and denied Cedar access to the snapshot data feeds.  RMI abruptly terminated Cedar's data

6    access only after Cedar launched its own competing shortline railroad TMS product, ARMS.

7        149.    RMI has forsaken short-term profits by refusing to enter into a data-sharing

8    arrangement with Cedar under which Cedar or customers would pay for access to data

9    exported from RailConnect, in an attempt to harm Cedar and prevent Cedar from successfully

10   launching Optiswitch and gaining a toehold with shortline railroad customers.

11       150.    RMI unilaterally terminated a voluntary and potentially profitable course of

12   dealing with Cedar, acting against its economic interest.  RMI has no legitimate business

13   rationale for refusing to deal with Cedar.

14       151.    RMI's actions have had and continue to have the effect of injuring the

15   competitive process and depriving shortline railroad customers of free choice, inhibiting

16   technological innovation, and reducing quality and output.  Furthermore, RMI's conduct does

17   not improve its product, efficiency, or ability to compete on the merits.  RMI's unlawful conduct

18   has caused and will continue to directly and proximately cause injury or loss to interstate

19   commerce and shortline railroad customers.

20       152.    RMI's refusal to deal with Cedar violates the Sherman Act, 15 U.S.C. § 2.

21       153.    As a result of RMI's unlawful acts, Cedar has suffered and will continue to suffer

22   direct and tangible injury.  Cedar is entitled to injunctive and monetary relief, including treble

23   damages and attorneys' fees, pursuant to 15 U.S.C. §§ 15 and 16.  Cedar's damages are not

24   speculative and will be proven at trial.

25

26

27

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 55
Case No. 2:21-cv-00437-TSZ

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

**SIXTH CLAIM FOR RELIEF**

**(Tortious Interference with Business Expectancy)**

154.    Cedar repeats and incorporates by reference all preceding paragraphs and allegations.

155.    RMI has intentionally interfered with Cedar's business relationships and expectancies with respect to its Optiswitch and ARMS products.

156.    Cedar had business expectancies with at least 15 railroads that were enthusiastic about using Cedar's rail yard switching optimization program, Optiswitch.  In 2018, Cedar told RMI about Optiswitch and how it could benefit shortline railroad customers by analyzing the inventory data that railroads store in their TMSs and improving their efficiency.  RMI provided inventory data to Cedar for 15 RailConnect customers, all of which began using Optiswitch, but Cedar could not execute contracts with those railroads because RMI refused to enter into a data-sharing arrangement with Cedar, and Cedar's continued access to the railroads' data was therefore unreliable.  Initially, RMI expressed interest in a strategic business alignment, but it strung along Cedar and its railroad customers for nearly two years until it became clear that those customers would never be able to use Optiswitch with RailConnect permanently.

157.    RMI intentionally prevented Cedar from realizing these business expectancies even though Optiswitch was not in direct competition with RailConnect.  In fact, Optiswitch depended on snapshot data feeds exported from RailConnect to operate and would have provided a huge increase in value for railroads that used RailConnect in conjunction with Optiswitch.

158.    On November 4, 2020, RMI unilaterally revoked Cedar's authorization to use TMS inventory data via snapshot data feeds that they had previously granted for the 15 railroads trying Optiswitch by resetting the FTP login credentials for those railroads without notice.  This revocation cut off those railroads' ability to use Optiswitch.  RMI's conduct, therefore, caused these 15 railroads to end their business relationships with Cedar.

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

159.    RMI's conduct prevented Cedar from continuing to market Optiswitch because RMI already controlled over 80% of the Shortline Railroad TMS Market.

160.    RMI has also intentionally interfered with Cedar's ability to market and enter into contracts for its TMS product, ARMS.  When RMI learned that some former ShipXpress customers, such as TNW, were going to let their RMI contracts expire and then switch to ARMS, RMI sent notice of termination letters to those customers, threatening them with termination of services unless they signed a new multi-year contract with RMI.  RMI employed this tactic as soon as it learned that Cedar had won a bid to create a new TMS for TRRA and would create competition in the Shortline Railroad TMS Market.

161.    RMI's conduct, therefore, prevented Cedar from contracting with railroads that seek innovative TMS technology and robust support.  Thus, RMI intentionally interfered for an improper purpose—to harm Cedar and strengthen its monopoly—and caused Cedar to lose potential business opportunities with the railroads, such as TNW , who had expressed interest in switching to ARMS.

162.    RMI's intentional interference with Cedar's business expectancies has harmed Cedar by preventing it from realizing a return on its substantial investment in the development of Optiswitch and ARMS.  Cedar's damages are not speculative and will be proven at trial.

**SEVENTH CLAIM FOR RELIEF**

**(Unfair Methods of Competition in Violation of Wash. Rev. Code § 19.86.020)**

163.    Cedar repeats and incorporates by reference all preceding paragraphs and allegations.

164.    RMI engaged in unfair methods of competition and deceptive and unfair practices and acts that were injurious to the public interest and did not constitute legitimate business practices.

165.    RMI unfairly interfered with Cedar's existing and potential business relationships with existing and potential Optiswitch customers.  After Cedar developed Optiswitch, RMI expressed interest in a strategic business alignment with Cedar and provided TMS inventory

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 57
Case No. 2:21-cv-00437-TSZ

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  data for 15 railroads using RailConnect.  But RMI refused to link Optiswitch and RailConnect

2  through an API or other real-time data-sharing arrangement unless Wabtec acquired Cedar.

3  This prevented Cedar from entering into contractual relationships with those 15 railroads.  In

4  November 2020, RMI revoked Cedar's authorization to use TMS inventory data without notice

5  by unilaterally resetting the FTP login credentials for those railroads and thus preventing those

6  railroads from using Optiswitch.  RMI's actions were deceptive and unfair, and not justified by

7  any legitimate business purpose.

8      166.    RMI's deceptive and unfair practices prevented railroads from benefiting from

9  Optiswitch's groundbreaking rail yard optimization tool, causing injury to railroads and the

10  public.

11      167.    Cedar has been injured directly by RMI's deceptive and unfair practices with

12  respect to Optiswitch, including the loss of existing business relationships with 15 railroads and

13  potential business relationships with countless other railroads.

14      168.    In addition, RMI has acquired and willfully maintained a monopoly in the

15  Shortline Railroad TMS Market through unfair methods of competition.  For example, RMI

16  acquired its only existing competitor in the market, ShipXpress, and retired its competing

17  product.  Wabtec has similarly attempted to acquire Cedar in order to thwart its competitive

18  threat in the Shortline Railroad TMS Market.  RMI also threatened to terminate its existing

19  customers' TMS services unless they agreed to sign multi-year contracts with RMI, effectively

20  precluding them from switching to an alternative TMS supplier like Cedar.  RMI has also coerced

21  customers into signing long-term contracts with substantial early termination fees, which

22  prevents customers from switching to alternative suppliers, and has restricted customers'

23  access to their historical data, which deters customers from switching TMS providers.  RMI's

24  lawsuit against Cedar is yet another anticompetitive tactic designed to exclude competition in

25  the relevant market.  As alleged above, Cedar took substantial and reasonable steps to enter

26  the Shortline Railroad TMS Market and has been injured directly by RMI's unfair methods of

27  competition.

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 58
Case No. 2:21-cv-00437-TSZ

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

169.     Cedar is entitled to injunctive and monetary relief, including treble damages and attorneys' fees, and civil penalties pursuant to WASH. REV. CODE §§ 19.86.090 and 19.86.140. Cedar's damages are not speculative and will be proven at trial.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Counterclaim Plaintiff Cedar respectfully requests that judgment be entered in its favor on each of the foregoing claims for relief, and that this Court enter an Order:

A.     Enjoining Counterclaim and Third-Party Defendants RMI, GE, and Wabtec from engaging in further anticompetitive, tortious and unfair conduct;

B.     Awarding Cedar damages in an amount to be proven at trial, trebled pursuant to 15 U.S.C. § 15(a) and WASH. REV. CODE § 19.86.090;

C.     Awarding Cedar its attorneys' fees, pursuant to at least 15 U.S.C. §§ 15(a) and 1117(a), and WASH. REV. CODE § 19.186.150;

D.     Awarding Cedar its costs;

E.     Awarding Cedar pre- and post-judgment interest, to the extent allowable; and

F.     Awarding such other and further relief as equity and justice may require.

RESPECTFULLY SUBMITTED AND DATED this 24th day of November, 2021.

TERRELL MARSHALL LAW GROUP PLLC

By: /s/ Beth E. Terrell, WSBA #26759
    Beth E. Terrell, WSBA #26759
    Email: bterrell@terrellmarshall.com
    Adrienne D. McEntee, WSBA #34061
    Email: amcentee@terrellmarshall.com
    936 North 34th Street, Suite 300
    Seattle, Washington 98103-8869
    Telephone: (206) 816-6603
    Facsimile: (206) 319-5450

DEFENDANTS CEDAR AI, INC., MARIO PONTICELLO, AND DARIL VILHENA'S
ANSWER AND AFFIRMATIVE DEFENSES AND DEFENDANT CEDAR AI, INC.'S
COUNTERCLAIM AND THIRD-PARTY COMPLAINT - 59
Case No. 2:21-cv-00437-TSZ

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1

2

MORRISON & FOERSTER LLP

3
By: /s/ Bonnie Lau
Bonnie Lau (*pro hac vice* pending)
4
Email: blau@mofo.com
Margaret A. Webb (*pro hac vice* pending)
5
Email: mwebb@mofo.com
425 Market Street
6
San Francisco, CA 94105
Telephone: (415) 268-7000
7
Facsimile: (415) 268-7522
8

9
David D. Cross (*pro hac vice* pending)
Email: dcross@mofo.com
10
Mary G. Kaiser (*pro hac vice* pending)
Email: mkaiser@mofo.com
11
2100 L Street, NW
Suite 900
12
Washington, DC 20037
Telephone: (202) 887-1500
13
Facsimile: (202) 887-0763
14

15
*Attorneys for Defendants and Counterclaim Plaintiff*

16

17

18

19

20

21

22

23

24

25

26

27