UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

RAILCAR MANAGEMENT, LLC,

   Plaintiff,

v.

CEDAR AI, INC.; MARIO PONTICELLO; DARIL VILHENA; and YI CHEN,

   Defendants,

v.

WABTEC CORPORATION,

   Third-Party Defendant.

C21-0437 TSZ

ORDER

THIS MATTER comes before the Court on a motion for partial judgment on the pleadings, docket no. 130, brought by defendants Cedar AI, Inc. ("Cedar AI"), Mario Ponticello, Daril Vilhena, and Yi Chen. Having reviewed, with one exception,[1] all papers filed in support of, and in opposition to, the motion, including the supplemental briefs, docket nos. 161 and 162, submitted at the direction of the Court, see Minute Order at ¶ 2 (docket no. 158), the Court enters the following Order.

---

[1] The Court previously ruled that it would not consider Exhibit A, docket no. 132-1, to defendants' request for judicial notice. See Minute Order at ¶ 1 (docket no. 158).

ORDER - 1

**Background**

Plaintiff Railcar Management, LLC offers a transportation management system ("TMS") known as "RailConnect." See 2d Am. Compl. at ¶¶ 1–2 (docket no. 99). RailConnect is used by various "shortline" (or Class II and III) railroads to manage their "rail and intermodal operations, signal and communications assets, railcar repair billing and inventory, and multi-model visibility, planning, and execution for industrial shippers and logistics service providers." Id. at ¶ 2; see Countercl. at ¶¶ 10–11 (docket no. 102 at 40); Answer to Countercl. at ¶ 10 (docket no. 119). RailConnect collects and stores data about plaintiff's "customers' rail cars, including content and location, routing and railroad information, and the origins and destination[s] of rail cars." 2d Am. Compl. at ¶ 20. Plaintiff's customers can access certain folders that contain data extracted from RailConnect by using credentials provided by plaintiff to access plaintiff's file-transfer-protocol ("FTP") website. Id. at ¶ 21.

In this action, plaintiff alleges that defendants accessed RailConnect and/or the FTP website without authorization and downloaded or uploaded data, causing plaintiff to suffer damages in the form of lost customers and expenses associated with investigating and addressing the allegedly illegal conduct. See id. at ¶¶ 24–58 & 86–88. Plaintiff asserts eight causes of action, the first seven of which are against all defendants, and the last of which is brought against only Cedar AI and Yi Chen: (i) violation of the Counterfeit Access Device and Computer Fraud and Abuse Act of 1984 ("CFAA"); (ii) violation of the Stored Wire and Electronic Communications and Transactional Records Access provisions of the Electronic Communications Privacy Act of 1986, also

ORDER - 2

known as the Stored Communications Act ("SCA"); (iii) violation of the trade secrets provisions of the Economic Espionage Act of 1996; (iv) violation of Washington's Uniform Trade Secrets Act; (v) violation of Washington's Consumer Protection Act ("CPA"); (vi) tortious interference with business relationships; (vii) trespass to chattels; and (viii) negligence. *Id.* at ¶¶ 44–92.

In responding to plaintiff's Second Amended Complaint, Cedar AI pleaded various counterclaims and facts to support them. *See* Answer, Countercl., and 3d-Party Compl. (docket no. 102). Some of those facts were admitted in plaintiff's answer to Cedar AI's counterclaims. *See* Answer to Countercl. (docket no. 119). Defendants now move for partial judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) as to plaintiff's first (CFAA), second (SCA), fifth (CPA), seventh (trespass), and eighth (negligence) claims.

**Discussion**

Judgment on the pleadings is proper only when no issues of material fact exist, and the moving party is entitled to judgment as a matter of law. *See Gen. Conf. Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregational Church*, 887 F.2d 228, 230 (9th Cir. 1989); *see also* Fed. R. Civ. P. 12(c). In deciding a motion for judgment on the pleadings, the Court must accept as true all facts plausibly alleged by the party opposing the motion and construe the pleadings in the light most favorable to the non-moving party. *See Unite Here Local 30 v. Sycuan Band of the Kumeyaay Nation*, 35 F.4th 695, 700 (9th Cir. 2022).

ORDER - 3

A. **Computer Fraud and Abuse Act, 18 U.S.C. § 1030**
**Plaintiff's First Claim Against All Defendants**

In pleading its claim under the CFAA, plaintiff did not specify which section it alleges defendants violated. The statute cited by plaintiff describes multiple offenses, three of which require either an "intent to defraud" or an "intent to extort," 18 U.S.C. §§ 1030(a)(4), (a)(6), & (a)(7), and others of which involve information or equipment belonging to the federal government or a financial institution or the like, see id. at §§ 1030(a)(1), (a)(2)(A)–(B), (a)(3), & (a)(6)(B). In its supplemental brief, plaintiff clarifies that it does not pursue a CFAA claim under any of the foregoing provisions, and that it accuses defendants of violating only §§ 1030(a)(2)(C) and (a)(5)(C).[2] See Pl.'s Suppl. Br. at 1–2 (docket no. 161 at 5–6).

1. **CFAA Claims Against Individual Defendants**

Both of plaintiff's CFAA claims against the individual defendants are insufficiently pleaded for the following reasons. With respect to both CFAA provisions, plaintiff sues Cedar AI's two Co-Chief Executive Officers ("Co-CEOs") and its Chief Technology Officer ("CTO"). Plaintiff alleges that Internet Protocol ("IP") addresses via which its RailConnect servers and/or its FTP website were accessed were "registered" to Co-CEO Daril Vilhena, and that Co-CEO Mario Ponticello is the billing contact for the related Amazon Web Services ("AWS") account. See 2d Am. Compl. at ¶¶ 6, 16–17, & 28–32. Identifying an IP address and an associated subscriber does not, however,

---

[2] Given plaintiff's concession, defendants' Rule 12(c) motion is GRANTED as to any claims brought under 18 U.S.C. §§ 1030(a)(1), (a)(2)(A), (a)(2)(B), (a)(3), (a)(4), (a)(5)(A), (a)(5)(B), (a)(6), or (a)(7), and any claims under those subsections are DISMISSED with prejudice.

ORDER - 4

establish that the subscriber engaged in any improper activity.  See Cobbler Nev., LLC v. Gonzales, 901 F.3d 1142, 1146–47 (9th Cir. 2018); see also hiQ Labs, Inc. v. LinkedIn Corp., 31 F.4th 1180, 1200–01 (9th Cir. 2022) (indicating that, because CFAA § 1030 applies to both civil actions and criminal prosecutions, the rule of lenity applies).  The operative pleading contains no allegation that Vilhena and/or Ponticello were personally involved in downloading information from the RailConnect or FTP systems, and they are entitled, for this reason, to judgment on the pleadings as to plaintiff's claims under §§ 1030(a)(2)(C) and (a)(5)(C).

      With respect to Yi Chen, Cedar AI's CTO, plaintiff relies on an acknowledgement by Cedar AI that Chen "changed the pull frequency for the snapshot data feeds," which plaintiff alleges "triggered the highly unusual and significantly harmful spike in activity in November 2020."  2d Am. Compl. at ¶¶ 8, 18, & 38–39.  The operative pleading states that, in 2018 and/or 2019, Cedar AI set up a "program" to access data from the FTP website for "at least 15 railroads."  Id. at ¶ 37.  Chen is accused of changing the "pull frequency" on this "program."  See id. at ¶ 38.  Plaintiff does not, however, specify where the "program" at issue resided, and it does not allege that the program could be altered only by accessing the RailConnect servers and/or FTP website.  Thus, the Second Amended Complaint fails to plead that Chen actually accessed plaintiff's "computer" or "protected computer," and Chen is also entitled to judgment pursuant to Rule 12(c) as to plaintiff's CFAA claims.

2.      **Section 1030(a)(2)(C) Claim Against Cedar AI**

With regard to a violation of CFAA § 1030(a)(2)(C), plaintiff has pleaded a plausible claim against Cedar AI.  Section 1030(a)(2)(C) prohibits "intentionally access[ing] a computer without authorization" and "obtain[ing] . . . information from any protected computer."  Plaintiff alleges that (i) its RailConnect servers and/or its FTP website were accessed by one or more individuals using various IP addresses assigned to Cedar AI, (ii) this activity occurred after plaintiff's parent company, Wabtec Corporation ("Wabtec"), sent a letter to Cedar AI's Co-CEOs expressing "strong concerns about the potential misuse of Wabtec confidential and proprietary data" and demanding that such data, "whether in physical or electronic form," be "immediately destroyed,"[3] and (iii) information was obtained via the allegedly unauthorized access of plaintiff's protected computer.  *See* 2d Am. Compl. at ¶¶ 4, 7, 31–35 & Ex. 2.  Contrary to Cedar AI's contention, plaintiff's CFAA claim pursuant to § 1030(a)(2)(C) is not subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b).[4]  Plaintiff pleads that Cedar AI has used the downloaded data to compete with and disparage

---

[3] Cedar AI alleges that, in May 2018, plaintiff provided Cedar AI access to snapshot data feeds for fifteen (15) railroads.  *See* Countercl. at ¶ 30 (docket no. 102 at 44).  According to Cedar AI, plaintiff gave Cedar AI "unique login credentials" to access plaintiff's "external FTP server where RailConnect automatically uploaded and stored the snapshot data files."  *Id.*  Plaintiff has denied these allegations.  *See* Answer to Countercl. (docket no. 119 at 13).  Cedar AI disputes whether Wabtec's letter dated March 31, 2020, revoked Cedar AI's previously-authorized access to the FTP website and/or server.  Whether Cedar AI was granted access and whether Wabtec's letter rescinded any such access constitute questions of fact that the Court cannot resolve on a Rule 12(c) motion.

[4] Cedar AI's reliance on *Oracle America, Inc. v. Service Key, LLC*, No. C 12-790, 2012 WL 6019580 (N.D. Cal. Dec. 3, 2012), is misplaced.  In *Oracle*, the district court concluded that the

ORDER - 6

plaintiff, neither of which are acts of fraud.  Whether plaintiff can prove its claim by a preponderance of the evidence is a question for another day.  With regard to plaintiff's § 1030(a)(2)(C) claim against Cedar AI, the Rule 12(c) motion is DENIED.

        3.        **<u>Section 1030(a)(5)(C) Claim Against Cedar AI</u>**

The Court reaches a different result as to plaintiff's claim under § 1030(a)(5)(C).  Section 1030(a)(5)(C) forbids "intentionally access[ing] a protected computer without authorization, and as a result of such conduct, caus[ing] damage and loss."  18 U.S.C. § 1030(a)(5)(C).  To prevail under this subsection, plaintiff must prove both "damage" and loss.  <u>Id.</u>.  "Damage" is defined in the CFAA as "any impairment to the integrity or availability of data, a program, a system, or information."  <u>Id.</u> at § 1030(e)(8).  In moving for judgment on the pleadings, Cedar AI argued that plaintiff failed to connect any unauthorized access of plaintiff's systems to an "*injury*" cognizable under the CFAA."  Defs.' Mot. at 14 (docket no. 130) (emphasis added).  The Court interprets Cedar AI's motion as asserting that plaintiff has not pleaded that Cedar AI's alleged access to the RailConnect servers and/or FTP website resulted in "impairment to the integrity or availability" of such equipment or the data stored in them.  This contention has merit.  Plaintiff alleges that it lost customers, suffered "multimillion-dollar business losses," and incurred expenses in investigating and addressing the alleged breach of its systems.  <u>See</u> 2d Am. Compl. at ¶¶ 10, 43, & 52 (docket no. 99).  These losses and costs do not

---

CFAA allegations sounded in fraud; the defendant was accused of "fraudulently inducing" Oracle's customers to cancel their agreements with Oracle, of making false representations about existing and potential customers' ability to obtain software patches and updates for their Oracle products, and of "fraudulent trafficking" in passwords.  <u>Id.</u> at *6.  <u>Oracle</u> is distinguishable.

ORDER - 7

constitute "damage" within the meaning of the CFAA, which must be strictly construed. See hiQ Labs, 31 F.4th at 1200–01. Cedar AI is therefore entitled to judgment on the pleadings as to plaintiff's CFAA claim under § 1030(a)(5)(C).

B.  **Stored Communications Act, 18 U.S.C. § 2701**
    **Plaintiff's Second Claim Against All Defendants**

The SCA criminalizes "intentionally access[ing] without authorization [or in excess of authorization] a facility through which an electronic communication service is provided." 18 U.S.C. § 2701(a). Violation of the SCA constitutes a felony if committed for the purpose of "commercial advantage, malicious destruction or damage, or private commercial gain." Id. at § 2701(b)(1). Civil remedies are available to providers of an electronic communication service, subscribers, or other aggrieved persons. Id. at § 2707(a). "Electronic communication service" means "any service which provides to users thereof the ability to send or receive wire or electronic communications." Id. at § 2510(15). "Subscriber" is not statutorily defined, but "aggrieved person" is "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." Id. at § 2510(11). Because a violation of the SCA gives rise to both criminal and civil liability, the statute must be construed consistently with the rule of lenity. See hiQ Labs, 31 F.4th at 1200–01.

The operative pleading asserts in conclusory fashion that plaintiff's RailConnect system and FTP website are "electronic communication services." 2d Am. Compl. at ¶ 54. The facts alleged in the Second Amended Complaint, however, contradict this contention, and the Court is not required, in deciding a Rule 12(c) motion, to accept as

ORDER - 8

true "a legal conclusion couched as a factual allegation." See Harris v. County of Orange, 682 F.3d 1126, 1131 (9th Cir. 2012).  In describing how Cedar AI accessed the RailConnect servers and/or FTP website, plaintiff refers only to IP addresses assigned to Amazon Web Services' subscribers, namely the Co-CEOs of Cedar AI.  See id. at ¶¶ 5–6 & 27–32; see also id. at ¶ 21 (stating that RailConnect may be accessed "via a website interface *hosted by AWS*, a well-known provider of on-demand cloud computing platforms and application programming interfaces to individuals, companies, and governments." (emphasis added)).  In other words, the electronic communication service at issue (*i.e.*, the means through which electronic communications were sent or received) was provided by AWS, not plaintiff.  See Cent. Bank & Tr. v. Smith, 215 F. Supp. 3d 1226, 1234 (D. Wyo. 2016) (indicating that examples of "electronic communication service" include telephone, Internet, email, and electronic bulletin board services).

Plaintiff does not allege that the RailConnect system and/or FTP website allow users to communicate directly with each other, and thus, they do not have the recognized indicia of an electronic communication service.  See Casillas v. Cypress Ins. Co., 770 F. App'x 329, 330 (9th Cir. 2019) ("websites and services that permit users to communicate directly with one another are considered [electronic communication service] providers").  Rather, RailConnect is described as "contain[ing] data" relating to "customers' rail cars" or "derived from the raw data [plaintiff] collects," 2d Am. Compl. at ¶ 20, which customers can obtain or view through plaintiff's FTP website using "unique login credentials," id. at ¶¶ 21–22.  The collecting, analysis, and storage of railroad-related data is not equivalent to the provision of electronic communication services.

ORDER - 9

Moreover, the operative pleading does not contain the word "facility," and plaintiff has not even alleged that the RailConnect servers and/or FTP website constitute facilities through which an electronic communication service ("ECS") is provided.  See Cent. Bank, 215 F. Supp. 3d at 1235 (the relevant "facilities" for purposes of the SCA "are not computers that *enable* the use of an electronic communication service, but instead are facilities that are *operated by* electronic communication service providers" (emphasis in original, quoting Freedom Banc Mortg. Servs., Inc. v. O'Harra, No. 11-cv-1073, 2012 WL 3862209, at *9 (S.D. Ohio Sept. 5, 2012)).  Plaintiff has also failed to plead that it qualifies as an entity authorized to bring a civil action under the SCA.  Plaintiff is not an ECS provider, and it has not attempted to sue in the capacity of an ECS subscriber or other aggrieved person.  Just like Central Bank & Trust in the District of Wyoming case, plaintiff in this matter is trying "to put a square peg of facts in a round hole of law."  Cent. Bank, 215 F. Supp. 3d at 1234.  The factual scenario of this matter does not fit an SCA claim, and defendants are entitled to judgment on the pleadings pursuant to Rule 12(c) as to plaintiff's SCA claim.[5]

C. **Consumer Protection Act, RCW Chapter 19.86**
**Plaintiff's Fifth Claim Against All Defendants**

To establish a violation of the CPA, a private plaintiff must prove:  (i) the defendant engaged in an unfair or deceptive act or practice; (ii) such act or practice occurred in the conduct of trade or commerce; (iii) such act or practice affected the public

---

[5] An additional or alternate basis for granting judgment in favor of the individual defendants on plaintiff's SCA claim is the lack of any allegation linking Vilhena, Ponticello, and Chen personally to the allegedly illegal access of plaintiff's TMS.

ORDER - 10

interest; (iv) the plaintiff suffered an injury to his, her, or its business or property; and (v) a causal relationship exists between the defendant's act or practice and the plaintiff's injury. Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wn.2d 778, 785–93, 719 P.2d 531 (1986). Defendants contend that plaintiff has not pleaded facts to support the "public interest" element of a CPA claim. The required "public interest" effect may be established in three ways: (1) when the conduct at issue violates a statute that incorporates RCW Chapter 19.86; (2) when the conduct at issue violates a statute that contains a specific legislative declaration of a public interest impact; or (3) when the conduct at issue injured other persons or had or has the capacity to injure other persons. See RCW 19.86.093. Plaintiff relies solely on the third means of proving the "public interest" element.

Plaintiff makes no allegation that the conduct at issue, which involved only plaintiff's RailConnect system and/or FTP website and defendants' alleged efforts to compete with and/or disparage plaintiff, actually injured others or *had* the capacity to injure others; plaintiff contends only that the conduct at issue *has* the capacity to injure others. Plaintiff asserts that it has sufficiently pleaded a "public interest" impact, pursuant to the "*has* capacity" prong of RCW 19.86.093(3), by indicating that defendants violated the CPA in the course of their business and "actively sought out" plaintiff as the target for their "wrongdoings." Pl.'s Resp. at 18 (docket no. 153).[6] Plaintiff's argument lacks merit.

---

[6] In Hangman Ridge, the Washington Supreme Court articulated four factors for determining whether allegedly unfair or deceptive acts affect the public interest: (1) whether the alleged acts

ORDER - 11

This litigation concerns a private dispute between two competitors in an industry that does not market any product directly to the average consumer.  Plaintiff makes no allegation that Cedar AI advertises to or actively solicits members of the general public, or that Cedar AI presents a risk of accessing without authorization the transportation management systems of other entities.  Moreover, although the parties might occupy unequal bargaining positions, plaintiff is not the entity with the competitive disadvantage.  Plaintiff is a subsidiary of Westinghouse Air Brake Technologies Corporation d/b/a Wabtec Corporation, which is "a leading global provider of equipment, systems, digital solutions, and other freight and transit rail services."  2d Am. Compl. at ¶ 14.  Wabtec is a publicly-held corporation trading on the New York Stock Exchange.  Pl.'s Corp. Discl. Stmt. (docket no. 4).  Cedar AI, which alleges that plaintiff has an over 80% share of the shortline railroad TMS market, <u>see</u> Countercl. at ¶¶ 16, 83, & 100 (docket no. 102), appears to be the "David" to plaintiff's "Goliath" in this case, and a reasonable inference from all of the pleadings is that Cedar AI's conduct vis-à-vis plaintiff arises from plaintiff's unique position as the industry leader.  Plaintiff has not alleged facts showing the requisite "real and substantial potential for repetition," for example, a prevalence of

---

were committed in the course of the defendant's business; (2) whether the defendant advertised to the public in general; (3) whether the defendant actively solicited the plaintiff in particular, thereby indicating potential solicitation of others; and (4) whether the plaintiff and the defendant occupy unequal bargaining positions.  <u>Hangman Ridge</u>, 105 Wn.2d at 790–91; <u>see also</u> <u>Stiegler v. Saldat</u>, No. C14-1309, 2015 WL 13686087, at *3 (W.D. Wash. Oct. 23, 2015) (observing that, in the wake of the 2009 enactment of RCW 19.86.093, Washington courts have not abandoned the factors articulated over twenty years earlier in <u>Hangman Ridge</u>).  Although plaintiff correctly observes that none of the <u>Hangman Ridge</u> factors are individually dispositive and that not all of them need to be satisfied to establish a "public interest" impact, <u>see</u> 105 Wn.2d at 791, the Court will not, as plaintiff appears to suggest, simply ignore factors that negate plaintiff's ability to prove the "public interest" element of its CPA claim.

ORDER - 12

other TMS companies or a motive, incentive, or opportunity to target them, and plaintiff has not demonstrated that its CPA claim would serve the public interest.  See Michael v. Mosquera-Lacy, 165 Wn.2d 595, 604–05, 200 P.3d 695 (2009).  In sum, plaintiff has not plausibly pleaded that defendants' alleged behavior actually did, or *had* or *has* the capacity to, injure other persons, and defendants are entitled to judgment on the pleadings on plaintiff's CPA claim.  In addition or in the alternative, for the same reasons that plaintiff's CFAA and SCA claims against the individual defendants fail, Vilhena, Ponticello, and Chen are entitled to judgment in their favor on plaintiff's CPA claim.

**D.      Trespass to Chattels, Washington Common Law
         Plaintiff's Seventh Claim Against All Defendants**

In seeking judgment on the pleadings, defendants contend that plaintiff has not pleaded the necessary elements of trespass to chattels.  With respect to plaintiff's claim against Cedar AI, this argument lacks merit.  According to the Restatement (Second) of Torts § 217, which is cited in the cases on which defendants rely, a trespass to a chattel may be committed by either (a) intentionally "dispossessing another of the chattel," or (b) intentionally "using or intermeddling with a chattel in the possession of another."  See United Fed'n of Churches, LLC v. Johnson, 598 F. Supp. 3d 1084, 1100 (W.D. Wash. 2002) (quoting Restatement (Second) of Torts § 217 (1965)); see also Sexton v. Brown, No. 61363-4-I, 2008 WL 4616705, at *5 (Wash. Ct. App. Oct. 20, 2008) (same).  As to Cedar AI, plaintiff has alleged sufficient facts to support the second ("using or intermeddling") means of engaging in trespass to chattels.

Defendants, however, assert that plaintiff must also prove impairment of the chattel, deprivation of the chattel's use for a substantial time, or bodily or other harm,

ORDER - 13

citing Restatement (Second) of Torts § 218 (1965).  This section of the Restatement has not been expressly adopted by Washington courts, and defendants cite solely to a district court decision that quoted a portion of one of the comments to § 218.  See *Del Vecchio v. Amazon.com, Inc.*, No. C11-366, 2012 WL 1997697 (W.D. Wash. June 1, 2012).

*Del Vecchio* is factually distinguishable.  In *Del Vecchio*, the plaintiffs sued Amazon for trespass to chattels in connection with the transfer to their computers of web browser "cookies."  *Id.* at *1–2.  The plaintiffs failed to plead any facts from which the *Del Vecchio* Court could infer any harm; not a single plaintiff alleged that he or she "even noticed any diminution in the performance" of his or her computer.  *Id.* at *8.  In contrast, in this case, plaintiff accuses Cedar AI of improperly accessing the RailConnect and/or FTP servers and downloading confidential information.  Thus, unlike in *Del Vecchio*, the chattel at issue in this matter is not just plaintiff's equipment, but also its electronically-stored data, which plaintiff alleges Cedar AI used to compete with and/or disparage it, causing millions of dollars of loss.

In addition, *Del Vecchio* is not persuasive because it did not consider the entire Restatement comment.  In granting a motion to dismiss, the *Del Vecchio* Court observed that "[t]he interest of a possessor of a chattel in its inviolability, unlike the similar interest of a possessor of land, is not given legal protection by an action for nominal damages for harmless intermeddlings with the chattel."  *Id.* (quoting Restatement (Second) of Torts § 218 cmt. e).  The *Del Vecchio* Court ignored the following language in the same comment:  "Sufficient legal protection of the possessor's interest in the mere inviolability of his chattel is afforded by his privilege to use reasonable force to protect his possession

ORDER - 14

against even harmless interference." Restatement (Second) of Torts § 218 cmt. e. This sentence suggests that § 218 applies only to tangible items, which can be physically safeguarded. Section 218 does not appear to contemplate cyber attacks, computer hacking, and the like, which generally cannot be prevented by "reasonable force," and which can cause disruption and loss even when the physical chattel (*i.e.*, the hardware) remains unimpaired and undamaged. *Cf. Sotelo v. DirectRevenue, LLC*, 384 F. Supp. 2d 1219, 1232–33 (N.D. Ill. 2005) (recognizing as actionable injuries, in connection with the closing of unwanted pop-up advertisements, the computer user's lost productivity and wasted time).

Finally, almost ten years after *Del Vecchio*, the Ninth Circuit recognized trespass-to-chattels claims under state common law as potential alternatives to CFAA claims. *See hiQ Labs*, 31 F.4th at 1201. Plaintiff has pleaded a plausible claim that one or more agents of Cedar AI trespassed into plaintiff's TMS, and the Rule 12(c) motion is DENIED with respect to the trespass-to-chattels claim against Cedar AI. Plaintiff has not, however, alleged sufficient facts to support a plausible or reasonable inference that any of the individual defendants personally accessed plaintiff's RailConnect servers and/or FTP website, and Vilhena, Ponticello, and Chen are entitled to judgment in their favor on plaintiff's trespass-to-chattels claim.

E. **Negligence, Washington Common Law**
   **Plaintiff's Eighth Claim Against Cedar AI and Chen**

To prevail on a negligence claim, a plaintiff must prove (i) the existence of a duty owed to the plaintiff by the defendant; (ii) the defendant's breach of such duty; (iii) a resulting injury to the plaintiff; and (iv) a causal link between the breach and the injury.

ORDER - 15

*See*, *e.g.*, Wuthrich v. King County, 185 Wn.2d 19, 25, 366 P.3d 926 (2016).  Cedar AI asserts that plaintiff has not adequately alleged the existence of a duty.  Cedar AI's own pleading, however, provides the factual basis for a plausible theory that Cedar AI owed a duty to plaintiff.  To the extent Cedar AI was given login credentials for accessing the RailConnect system and/or FTP website, a fact that plaintiff disputes, Cedar AI arguably had a duty to use such credentials appropriately and within the scope of the authority granted to Cedar AI.  Thus, judgment on the pleadings in favor of Cedar AI is not warranted, and the Rule 12(c) motion is DENIED with respect to the negligence claim against Cedar AI.

As to plaintiff's negligence claim against Chen, however, the Rule 12(c) motion is GRANTED.  Plaintiff alleges that "Chen, acting through Cedar, owed a duty of reasonable care." 2d Am. Compl. at ¶ 90.  Plaintiff has confused the principal and the agent in this matter.  Cedar AI is the principal; Cedar AI might act through Chen and be held liable for Chen's conduct, but Chen cannot act through Cedar.  The operative pleading contains no other reference to any personal duty that Chen owed to plaintiff, and the Court concludes, as a matter of law, that Chen owed no duty to plaintiff, apart from his role as an agent of Cedar AI, in connection with "increasing the pull frequency on Data downloaded from the RailConnect FTP Site." *Id.* at ¶ 91; *see* Wuthrich, 185 Wn.2d at 25 ("The existence and scope of a duty are questions of law.").  Chen is entitled to judgment under Rule 12(c) as to plaintiff's negligence claim.

**Conclusion**

For the foregoing reasons, the Court ORDERS as follows:

(1) Defendants' motion, docket no. 130, a redacted version of which was filed as docket no. 128, for partial judgment on the pleadings is GRANTED in part and DENIED in part.

(2) Any claims brought by plaintiff under 18 U.S.C. §§ 1030(a)(1), (a)(2)(A), (a)(2)(B), (a)(3), (a)(4), (a)(5)(A), (a)(5)(B), (a)(6), and/or (a)(7) are DISMISSED with prejudice.

(3) Judgment on the pleadings will be entered in favor of the individual defendants, namely Mario Ponticello, Daril Vilhena, and Yi Chen, and against plaintiff, on plaintiff's CFAA, SCA, CPA, trespass-to-chattels, and negligence claims.

(4) Judgment on the pleadings will be entered in favor of Cedar AI, and against plaintiff, on plaintiff's claims under CFAA § 1030(a)(5)(C), the SCA, and the CPA.

(5) The Court defers entry of judgment until after all claims asserted against defendants, and counterclaims brought by Cedar AI, are resolved.

(6) Plaintiff's claims against Cedar AI for violation of CFAA § 1030(a)(2)(C), trespass to chattels, and negligence, as well as plaintiff's claims against all defendants for violation of the trade secrets provisions of the Economic Espionage Act of 1996, violation of Washington's Uniform Trade Secrets Act, and tortious interference with business relationships, remain pending.

(7) The Clerk is DIRECTED to send a copy of this Order to all counsel of record.

IT IS SO ORDERED.

DATED this 16th day of March, 2023.

Thomas S. Zilly
United States District Judge